**Docket No. 25-55**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION and OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM,

*Plaintiffs-Appellants,*

THOMAS LAMONTAGNE,

*Plaintiff,*

v.

TESLA INC. and ELON MUSK,

*Defendants-Appellees,*

ZACHARY J. KIRKHORN and DEEPAK AHUJA,

*Defendants.*

*Appeal from a Decision of the United States District Court for the Northern District of California, No. 3:23-cv-00869-AMO · Honorable Araceli Martínez-Olguín*

## ANSWERING BRIEF

ALEX SPIRO
ELLYDE R. THOMPSON
JESSE BERNSTEIN
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000 Telephone
(212) 849-7100 Facsimile
alexspiro@quinnemanuel.com
ellydethompson@quinnemanuel.com
jessebernstein@quinnemanuel.com

*Attorneys for Defendants-Appellees,
Tesla Inc. and Elon Musk*

 

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Tesla, Inc. states that it has no parent company and no publicly held company owns 10% or more of its stock.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................i

TABLE OF AUTHORITIES ............................................................i

PRELIMINARY STATEMENT ............................................................1

COUNTERSTATEMENT OF THE QUESTIONS PRESENTED...........................3

STATEMENT OF THE CASE ............................................................4

    A.   Tesla's Advanced Driver-Assistance Technology ...............................4

    B.   Plaintiffs' Amended Complaint ..........................................7

    C.   The Decision Below ....................................................8

    D.   The Scope Of The Appeal ..............................................11

SUMMARY OF ARGUMENT ............................................................11

STANDARD OF REVIEW ............................................................14

ARGUMENT ............................................................14

I.    THE JUDGMENT SHOULD BE AFFIRMED BECAUSE THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CLAIM FOR FAILURE TO ADEQUATELY ALLEGE SCIENTER .................................14

    A.   Defendants' Own Statements And Access To Information Undermine Any Inference Of Scienter ...............................15

        1.   Defendants' Risk Disclosures Contradict Any Inference Of Scienter ....................................16

        2.   Neither Defendants' Own Statements Nor Access To Information Satisfies The Legal Test For Pleading A Strong Inference Of Scienter ..................................18

        3.   The Allegations Do Not Satisfy The Core Operations Theory ....................................22

ii

       4.     The Confidential Witness Allegations Do Not Cure The Insufficient Scienter Allegations.................................................24

    B.    The Allegations In The Complaint Contradict Any Motive Theory.................................................................................................27

    C.    The District Court Correctly Held That, As A Whole, Plaintiffs' Allegations Fail To Plead Scienter........................................31

II.    THE JUDGMENT SHOULD BE AFFIRMED BECAUSE THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS DID NOT PLEAD A FALSE OR MISLEADING STATEMENT..................................................34

    A.    The District Court Correctly Ruled Defendants' Forward-Looking Statements Are Inactionable.................................................34

        1.     Defendants' Projections For FSDC's Development Are Forward-Looking Statements..................................................35

        2.     The Statutory Exclusion Does Not Apply ...............................38

        3.     The Earnings Call Statements Are Accompanied By Cautionary Language ................................................................41

        4.     The Bespeaks Caution Doctrine Protects All Defendants' Forward-Looking Statements..................................................44

        5.     Plaintiffs Fail To Allege Actual Knowledge Of Falsity ..........46

    B.    The District Court Correctly Held That The Timeline Statements Are Not False Or Misleading............................................46

    C.    The District Court Correctly Held That The Safety Statements Are Not False Or Misleading ..............................................................51

    D.    The District Court Correctly Held That The Capability Statements Are Not False Or Misleading............................................54

III.    THIS COURT MAY AFFIRM ON THE ALTERNATE GROUND THAT PLAINTIFFS FAILED TO ADEQUATELY PLEAD LOSS CAUSATION 57

CONCLUSION ....................................................................................................61

REQUEST FOR ORAL ARGUMENT ..............................................................62

iii

STATEMENT OF RELATED CASES ................................................................. 63

FORM 8: CERTIFICATE OF COMPLIANCE FOR BRIEFS .............................. 64

CERTIFICATE OF SERVICE ........................................................................... 65

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
    291 F.3d 336 (5th Cir. 2002) ...............................................................38

*In re Allied Nev. Gold Corp.*,
    2016 WL 4191017 (D. Nev. Aug. 8, 2016) .......................................45

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ...............................................................44

*Applestein v. Medivation, Inc.*,
    561 F. App'x 598 (9th Cir. 2014) .............................................26, 50

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    566 F. App'x 93 (2d Cir. 2014) .......................................................17

*Bao v. SolarCity Corp.*,
    2015 WL 1906105 (N.D. Cal. Apr. 27, 2015)...................................31

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...........................................................23

*Carvelli v. Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) .......................................................39

*CheckOut Holdings, LLC v. Amplified Holdings, Inc.*,
    64 F. App'x 631 (9th Cir. 2003) .......................................................34

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
    Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ....................................................15, 19

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012)............................................30

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) .........................................................60

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) .................................................42, 46

i

*In re Dot Hill Sys. Corp. Sec. Litig.*,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008)................................................17

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ....................................19, 25, 57

*Emps. Ret. Sys. of City of Baton Rouge & Par. of E. Baton Rouge v.
    MacroGenics, Inc.*,
    61 F.4th 369 (4th Cir. 2023) ...............................................38

*Emps. Teamsters Loc. Nos. 175 & 505 Pension
    Tr. Fund v. Clorox Co.*,
    353 F.3d 1125 (9th Cir. 2004) ............................................44

*Espy v. J2 Glob., Inc.*,
    99 F.4th 527 (9th Cir. 2024)....................................26, 56

*Foster v. Wilson*,
    504 F.3d 1046 (9th Cir. 2007) ............................................57

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) ............................................35

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ........................................18, 31

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ..............................................15

*Hoang v. Contextlogic, Inc.*,
    2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ....................30

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998) ................................................37

*In re Intel Corp. Sec. Litig.*,
    2023 WL 2767779 (N.D. Cal. Mar. 31, 2023),
    *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024) ............23

*In re Intel Corp. Sec. Litig.*,
    2024 WL 1693340 (9th Cir. Apr. 19, 2024).......................36

*Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*,
2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ...........................................21, 24

*Jedrzejczyk v. Skillz, Inc.*,
2024 WL 1635568 (9th Cir. Apr. 16, 2024) ......................................................53

*Johnson v. NYFIX, Inc.*,
399 F. Supp. 2d 105 (D. Conn. 2005)................................................................31

*Lapiner v. Camtek, Ltd.*,
2011 WL 445849 (N.D. Cal. Feb. 2, 2011) ......................................................29

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ..........................................................................18

*Loftus v. Primero Mining Corp.*,
230 F. Supp. 3d 1209 (C.D. Cal. 2017) ............................................................37

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ............................................................................59

*Lu v. Align Tech., Inc.*,
417 F. Supp. 3d 1266 (N.D. Cal. 2019) ............................................................52

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014),
*aff'd*, 604 F. App'x 62 (2d Cir. 2015)...............................................................47

*McGovney v. Aerohive Networks, Inc.*,
367 F. Supp. 3d 1038 (N.D. Cal. 2019) ............................................................49

*In re Mellanox Techs. Ltd. Sec. Litig.*,
2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) ................................................45

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......................................................18, 47, 53, 59

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020)...............................................................37

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) ...................................................23

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) .................................................................58

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ....................................15, 25, 27, 31, 32

*In re Nimble Storage, Inc. Sec. Litig.*,
  252 F. Supp. 3d 848 (N.D. Cal. 2017),
  *aff'd*, 756 F. App'x 779 (9th Cir. 2019) .........................................51

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .............................................................19

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013) .............................................................58

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .............................................................22

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
  2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ....................................29

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ......................................................26

*Omnicare, Inc. v. Laborers Dist. Council Constr.*
  *Indus. Pension Fund*,
  575 U.S. 175 (2015).............................................................................56

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ...............................................................58

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .................................. 24, 25, 26, 27, 41, 43, 45, 50

*Prodanova v. H.C. Wainwright & Co.*,
  993 F.3d 1097 (9th Cir. 2021) .............................................................23

*In re Qualcomm Inc. Sec. Litig.*,
  2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ....................................21

iv

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014), *overruled in part by as recognized in City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) .....................................................19, 24

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017).......................................................27

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020)...................................................25

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ...............................................................................44

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .....................................................19, 23, 24, 33

*S.E.C. v. Dain Rauscher, Inc.*,
  254 F.3d 852 (9th Cir. 2001) ...............................................................................40

*S.E.C. v. McNulty*,
  1996 WL 422259 (S.D.N.Y. July 29, 1996).......................................................39

*Saraf v. Ebix, Inc.*,
  632 F. Supp. 3d 389 (S.D.N.Y. 2022) ...............................................................33

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
  2007 WL 760535 (N.D. Cal. Mar. 9, 2007) .......................................................33

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  2000 WL 1727377 (N.D. Cal. Sept. 29, 2000)...........................................44, 45

*Tchrs.' Ret. Sys. of LA v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ...............................................................................58

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..........................................................14, 15, 29, 33, 34

*In re Toyota Motor Corp. Sec. Litig.*,
  2011 WL 2675395 (C.D. Cal. July 7, 2011).......................................................53

*United States v. Sierra Pac. Indus., Inc.*,
  862 F.3d 1157 (9th Cir. 2017) ...............................................................................45

v

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ............................................................29

*Veal v. Lendingclub Corp.*,
    2020 WL 3128909 (N.D. Cal. June 12, 2020),
    *aff'd*, 2021 WL 4281301 (9th Cir. Sept. 21, 2021) ...........................55

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ..............................................................30

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ...............................................................14

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..............................................16

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .............................................26, 36, 37, 47

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ..............................................................16

*Yaron v. Intersect ENT, Inc.*,
    2020 WL 6750568 (N.D. Cal. June 19, 2020).....................................59

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017) .......................................................43

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..............................14, 18, 26, 28, 34, 56

## Statutes And Regulations

15 U.S.C. § 78c(a)(8) ..............................................................................38

15 U.S.C. § 78u.................................................................14, 36, 38, 41, 42

17 C.F.R. § 240.13a-15(a)–(b)................................................................39

## PRELIMINARY STATEMENT

This appeal stems from Plaintiffs' election not to amend their complaint after the district court (Martínez-Olguín, J.) dismissed it for failing to plead securities fraud against Defendants Tesla Inc. and Elon Musk related to dozens of statements over a four-year period concerning Tesla's full self-driving technology. Plaintiffs do not appeal dismissal as to thirteen of the 29 statements. This Court should affirm dismissal of any Section 10(b) claim based on the remaining statements, all of which—like the statements as to which Plaintiffs do not appeal dismissal—concern the development of cutting-edge technology.

The district court correctly held that Plaintiffs failed to allege a strong inference of scienter, as required by the PSLRA. On appeal, Plaintiffs do not contest that Tesla warned of the exact risks that Plaintiffs plead came to fruition— for example, that Tesla may "experience . . . delays in launching . . . future features and services such as new Autopilot or FSD features and the autonomous Tesla ride-hailing network." 2-ER-219. Such disclosures strongly undermine any inference of fraudulent intent and, in contrast, render the inference of nonfraudulent intent particularly compelling. This forceful evidence contradicting any fraudulent intent stands in stark contrast to the routinely rejected, general allegations that Plaintiffs put forward that Musk "would have" possessed information contrary to his alleged misstatements.

1

Likewise, Plaintiffs contend that Musk's stock sales provide a motive, but fail to grapple with the fact that Musk's stock sales did not occur until *after* the first two alleged corrective disclosures and after the supposedly "[m]ost damning" evidence of falsity was public. Indeed, Plaintiffs' own allegations identify a motive for Musk's stock sales that directly contradicts any link to the misstatements—Musk's sale of stock in 2022 to fund his purchase of Twitter. Plaintiffs' allegations fall far short of the exacting pleading burden under the PSLRA, and the Court should affirm dismissal on this basis.

Separately, however, as the district court correctly held, Plaintiffs also fail to plead any materially false statement. Rather, the statements on which Plaintiffs rely to reinstate their Complaint constitute inactionable puffery or statements of opinion and lack any indicia of falsity. Plaintiffs fail to plead any contemporaneous information rendering the alleged misstatements false, and many of the purportedly "omitted" facts they identify were actually public during the Class Period before any purported "corrective disclosure" occurred. Nor can Plaintiffs succeed on their argument that the PSLRA Safe Harbor would not apply to the forward-looking statements they challenge on appeal. Review of the statements themselves confirms that, contrary to Plaintiffs' contention on appeal, these statements neither concern the omissions of present facts nor guarantee certain results. In any event, such statements all fall within the scope of the

Bespeaks Caution doctrine in light of Tesla's repeated warnings on the exact subject of the challenged statements.

Finally, in the alternative, the Court should affirm because Plaintiffs failed to plead loss causation, as demonstrated by the fact that Plaintiffs are not alleged to have suffered any loss after the disclosure of even the supposedly "[m]ost damning" evidence of falsity. Loss causation requires allegations that the disclosure of the relevant information necessary to assess the accuracy of a supposed misstatement was a substantial factor in causing a stock price decline, thus causing actual economic loss. While Plaintiffs identify the announcement of investigations, "recalls," and information previously known to the market as the supposed disclosures, none revealed any falsity and each event occurred *after* the revelation of the supposed evidence that Plaintiffs allege demonstrates falsity.

For each of these independent reasons, the Court should affirm.

## COUNTERSTATEMENT OF THE QUESTIONS PRESENTED

1.      Whether the judgment should be affirmed because the district court correctly dismissed Plaintiffs' Section 10(b) for failure to adequately plead scienter.

2.      Whether the judgment should be affirmed because the district court correctly dismissed Plaintiffs' Section 10(b) claim for failure to adequately plead that Defendants made any materially false or misleading statement.

3.  Whether, in the alternative, the judgment dismissing the Complaint should be affirmed because Plaintiffs failed to adequately plead loss causation.

## STATEMENT OF THE CASE

### A.  Tesla's Advanced Driver-Assistance Technology

Tesla is a cutting-edge clean energy company that manufactures and sells electric vehicles as well as energy storage devices and solar energy generation systems.  4-ER-570 ¶ 45.[1]  Tesla has been developing and improving self-driving technology for several years.  4-ER-570 ¶¶ 45–47.

Tesla vehicles come equipped with certain driver assistance features known as Autopilot.  4-ER-571 ¶ 50; 2-ER-209.  Autopilot includes Traffic-Aware Cruise Control, which matches the speed of the vehicle to that of the surrounding traffic, and Autosteer, which assists in steering within a clearly marked lane.  2-ER-203. During the Class Period, customers also could purchase a suite of enhanced driver assistance features known as "Full Self-Driving Capability."  4-ER-571 ¶ 50.  The "Full Self-Driving Capability" ("FSDC") package included features such as Traffic and Stop Sign Control (Beta), which identifies stop signs and traffic lights and automatically slows the vehicle to a stop on approach, and Navigate on Autopilot (Beta), which suggests lane changes and navigates interchanges.  2-ER-204.

---

[1]  Tesla disputes the accuracy of the allegations in the Complaint but accepts them as true for purposes of this appeal.

For both Autopilot and FSDC, Tesla was explicit that driver supervision is required, and "the driver is ultimately responsible for controlling the vehicle." 2-ER-218; 2-ER-289 (same); 2-ER-311 (same); 3-ER-331 (same); 4-ER-575 ¶ 65 (same); *see also* 2-ER-231 ("Autopilot and FSD features . . . currently require drivers to remain engaged."); 2-ER-203 ("Autopilot and [FSDC] are intended for use with a fully attentive driver, who has their hands on the wheel and is prepared to take over at any moment."). That is consistent with statements Tesla's CEO, Elon Musk, made to investors during the Class Period that Tesla was on a "*path towards* a vehicle that will drive 100% safer than a person." (3-ER-461) (emphasis added).

Such development—like all cutting-edge technologies—was not without delay or challenges. Musk himself acknowledged that he had "never really seen more kind of false dawns, or where it seems like we're going to break through but we don't, as I've seen in full self-driving." 3-ER-354. As an example, on November 2, 2021, Tesla—as it warned it may be required to do (*infra*, at 6)—announced it was recalling certain Autosteer on City Streets (Beta) software features. 4-ER-665 ¶ 382. This "recall" took the form of an over-the-air software update to Tesla vehicles. 4-ER-665 ¶ 382; 4-ER-571 ¶ 49.

In fact, Tesla and Musk consistently warned investors of the potential for delay and challenges. They cautioned investors that "[t]here is no guarantee that

we will be able to successfully and timely introduce and scale . . . new processes or features" and that Tesla may experience "delays or other complications in launching and/or ramping production of . . . future features and services such as new Autopilot or FSD features and the autonomous Tesla ride-hailing network." 2-ER-219; *see also* 2-ER-290 (similar); 2-ER-312 (similar); 3-ER-333 (similar). Musk and Tesla cautioned further that "certain features of our vehicles such as new Autopilot or FSD features [may] take longer than expected to become enabled." 2-ER-225; 2-ER-294; 3-ER-336. They warned investors that the software was "inherently complex and may contain latent defects and errors" and that efforts to remedy those issues "may not be timely, may hamper production[,] or may not be to the satisfaction of our customers." 2-ER-225; 2-ER-266; *see also* 2-ER-316 (similar). And they cautioned further that Tesla may "be compelled to undertake product recalls or take other similar actions." 2-ER-232; 2-ER-277; 2-ER-297; 2-ER-319; 3-ER-340.

Nonetheless, Tesla made significant progress on the development of Autopilot and FSDC throughout the Class Period, continuously developing software updates and functionalities that could be downloaded to existing vehicles when available. 4-ER-571 ¶ 49; 2-ER-204. "Autosteer on City Streets," for example, a feature within the FSDC package, became available to a small number of drivers for beta testing in October 2020. 4-ER-665–ER-666 ¶ 384.

6

A publicly available March 9, 2021 memo to file by an employee of the DMV (the "DMV Memo")[2] explained that Tesla was "at Level 2 currently" and that Musk was "extrapolating on the rates of improvement when speaking about L5 capabilities." 4-ER-621 ¶ 232. This is consistent with Musk's statements that he was "confident based on my understanding of the technical road map and the progress that we're making between each beta iteration." 4-ER-657 ¶ 357. The DMV Memo, however, reflects that "Tesla couldn't say if the rate of improvement would make it to L5 by end of [the] calendar year." 4-ER-621 ¶ 232.

## B. Plaintiffs' Amended Complaint

On February 27, 2023, a securities class action complaint was filed in the district court. 4-ER-748. The district court appointed Plaintiffs as Lead Plaintiffs. 4-ER-752. Plaintiffs then filed an Amended Complaint (the "Complaint"). 4-ER-554–ER-738.

Plaintiffs allege that three categories of statements Defendants made during the Class Period were false and misleading.

*Timeline Statements.* Plaintiffs allege that forward-looking statements regarding the anticipated timeline of the development and release of FSDC, such as "we will be feature complete full self driving this year" (4-ER-643 ¶ 313) and "I'm

---

[2] While the Complaint does not identify the exact date on which the memo became public, articles about it were published at least as of May 6, 2021. *See, e.g.*, https://www.reuters.com/business/autos-transportation/tesla-tells-regulator-that-full-self-driving-cars-may-not-be-achieved-by-year-2021-05-07/.

extremely confident of achieving full autonomy and releasing it to the Tesla customer base next year" (4-ER-654 ¶ 349), were false and misleading because "Tesla was nowhere near releasing Level 4-5" (Br. 38).

***Safety Statements.*** Plaintiffs allege that statements about the safety of Autopilot and FSDC features, such as "I think safety . . . is paramount for us" (4-ER-646 ¶ 325) and FSDC "will work at a safety level well above that of the average driver this year" (4-ER-656 ¶ 353), were false and misleading because Tesla allegedly did not prioritize safety, and Tesla's self-driving technology was allegedly "not able to drive itself at a safety level greater than . . . humans" (4-ER-645 ¶ 320).

***Capability Statements.*** Plaintiffs allege that statements regarding the capabilities of the FSDC technology, such as "it's almost getting to a point where I can go from my house to work with no interventions" (4-ER-652 ¶ 343) and "[t]he latest build is capable of zero intervention drives" (4-ER-653 ¶ 345), were false and misleading because they suggest "Tesla's [*sic*] had ***already*** achieved Level 4-5 autonomy" (Br. 33).

## C.    The Decision Below

Defendants moved to dismiss the Complaint. 2-ER-157–ER-189. The district court granted Defendants' motion to dismiss in full in a thorough and detailed opinion. 1-ER-3–ER-34.

8

On the Section 10(b) claim, the district court concluded that all but eleven of the alleged statements were protected under the PSLRA Safe Harbor or constituted inactionable puffery. 1-ER-9–ER-19. As to the remaining eleven statements, the district court determined that (i) Plaintiffs failed to allege Defendants made any materially false or misleading statements regarding the capabilities, safety, or timeline of FSDC; and (ii) Plaintiffs failed to allege facts giving a rise to a strong inference of scienter. 1-ER-19–ER-31.

As to the Timeline Statements, the district court concluded such statements constitute inactionable forward-looking statements because they "set forth a projected timeline for achieving autonomous driving technology, much like statements of a 'projected launch date for [a company's] products' and thus are plainly forward-looking statements of Tesla's plans and objectives." 1-ER-12 (alteration in original). It also held several Timeline Statements to be inactionable puffery. 1-ER-17–ER-18.

As to the Safety Statements, the district court determined that Plaintiffs "fail to provide 'contemporaneous reports or data' showing that the statement was false or misleading when made," but "[e]ven if this data existed at the time the statements were made, the fact that there were safety issues with the technology does not suggest that it was false or misleading to assert that the technology was

9

safer than regular human driving." 1-ER-22. It also held several Safety Statements to be inactionable puffery. 1-ER-18–ER-19.

As to the Capability Statements, the district court determined that "'the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection' to the substance of the Capability Statements, and do not allege that the software was not capable of no intervention drives." 1-ER-24.

The district court then evaluated Plaintiffs' scienter allegations and deemed them insufficient to raise a strong inference of an intent to defraud. 1-ER-24–ER-31. The district court explained that the allegations "fail to show that Defendants knew the statements were false, or indeed that there existed contemporaneous data about the capability and safety of the technology at the time the statements were made." 1-ER-25. The district court also rejected Plaintiffs' motive allegations, finding "the stock sales (over a four-year period) were not linked to any purported misstatement or corrective disclosure, and the timing of sales undermines any inference of scienter." 1-ER-29.

The district court dismissed Plaintiffs' claims alleging violations of Item 105, Item 303, and Rule 10b-5(a) and (c), as well as Plaintiffs' Section 20(a) claim. 1-ER-31–ER-34.

The Court granted Plaintiffs leave to amend. 1-ER-34. Plaintiffs elected not to file a second amended complaint, resulting in dismissal with prejudice. 2-ER-36–ER-39. On November 26, 2024, the district court entered judgment. 1-ER-2.

### D.    The Scope Of The Appeal

Plaintiffs filed their appeal following entry of judgment. 4-ER-739. Plaintiffs do not appeal the district court's dismissal of the claim based on Item 105, Item 303, Rule 10b-5(a), Rule 10b-5(c), or Section 20(a). Br. 22 n.3. Nor do Plaintiffs seek to reinstate each of the alleged misstatements in their Complaint. Br. 27 & n.4. Instead, Plaintiffs appeal the dismissal of their Section 10(b) claim based on six Safety Statements, six Capability Statements, and seven Timeline Statements.[3]

## SUMMARY OF ARGUMENT

This Court should affirm the judgment dismissing the Complaint because Plaintiffs have failed to plead the necessary elements of their Section 10(b) claim.

The district court correctly concluded that Plaintiffs failed to plead facts giving rise to a strong inference of scienter. This Court repeatedly has affirmed

---

[3]    The Safety Statements are Nos. 4, 19, 21, 24, and 27–28. *See* 4-ER-644–ER-645 ¶ 319; 4-ER-654 ¶ 349; 4-ER-656 ¶ 353; 4-ER-658 ¶ 359; 4-ER-659 ¶ 365; 4-ER-660 ¶ 367. The Capability Statements are Nos. 6, 16–17, 20, 22, and 25. *See* 4-ER-646 ¶ 323; 4-ER-652 ¶ 343; 4-ER-653 ¶ 345; 4-ER-655 ¶ 351; 4-ER-656 ¶ 355; 4-ER-658 ¶ 361. The Timeline Statements are Nos. 1–3, 6, 16, and 19–20. *See* 4-ER-642–ER-643 ¶ 313; 4-ER-643 ¶ 315; 4-ER-644 ¶ 317; 4-ER-646 ¶ 323; 4-ER-652 ¶ 343; 4-ER-654 ¶ 349; 4-ER-655 ¶ 351.

dismissal of securities fraud cases in which a plaintiff fails to allege particularized facts demonstrating defendants had access to specific contrary information undercutting their public statements. Here, Plaintiffs make only generic allegations that Musk was involved in and kept informed of FSDC developments without identifying what specific information Musk received, when, or how it made him aware that his statements were false or his projections were impossible. Unable to plead with particularity any contrary information Musk had, Plaintiffs rely on allegations that self-driving is a "core operation," and that the statements themselves imply scienter, but these are exactly the kind of generic allegations lacking specific details that this Court routinely rejects. And, as the district court correctly ruled, Plaintiffs' allegations regarding Musk's stock sales during the Class Period fail to tie the timing of the sales to any alleged misstatement or corrective disclosure. Indeed, Plaintiffs offer a more plausible, non-fraudulent explanation for the sales: Musk's impending Twitter purchase. Nor can Plaintiffs contest that Tesla warned investors of the exact risks that Plaintiffs contend Defendants concealed, facts that undermine any inference of fraudulent intent.

The district court also correctly concluded that Plaintiffs failed to plead facts establishing that Defendants made any materially misleading statement or omission regarding development of FSDC. Plaintiffs repeatedly mischaracterize the statements at issue, falsely asserting that Defendants represented that FSDC "could

already 'self-drive' safer than human drivers" (Br. 28) or "had already achieved Level 4-5 autonomy" (Br. 33) (emphasis omitted), but the actual statements themselves make much more nuanced representations to investors that Plaintiffs cannot allege are false. Despite purported access to several confidential witnesses ("CWs"), Plaintiffs' allegations are simply too generalized or disconnected from the actual content of the alleged misstatements to adequately plead falsity.

In the alternative, this Court can affirm based on the Complaint's failure to adequately plead loss causation. Despite making much of the DMV Letters in their brief, including claiming (Br. 15) they were the "most damning" evidence that Defendants' statements were false, Plaintiffs do not allege the disclosure of those letters as a loss causation event. Instead, Plaintiffs rely on five purported corrective disclosures (4-ER-662–ER-673 ¶¶ 377–402), but three of those "events" were merely the announcement of an investigation, a letter reflecting customer complaints, and an over-the-air software "recall" (really just a software update), which courts have held do not constitute corrective disclosures sufficient to allege loss causation. As to the fourth corrective disclosure—Musk's statement that FSDC was not yet safer than a human—such allegations do not sufficiently plead loss causation because Defendants had never previously said otherwise, severing the connection between any of the alleged misstatements and the purported corrective disclosure. Simply put, none of the corrective disclosures revealed any

prior misstatements or supposed fraud.

## STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss *de novo*. *See Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 617 (9th Cir. 2022).

## ARGUMENT

**I.  THE JUDGMENT SHOULD BE AFFIRMED BECAUSE THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CLAIM FOR FAILURE TO ADEQUATELY ALLEGE SCIENTER**

Plaintiffs demonstrate no error in the district court's dismissal of the Section 10(b) claim for failing to meet the high bar for pleading scienter.

A complaint for securities fraud must allege the defendant acted with "scienter," which is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). The PSLRA requires plaintiffs to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).

It is not enough to allege facts from which an inference of scienter "*could* be drawn." *Tellabs*, 551 U.S. at 323. Rather, a plaintiff must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference," *id.*, that "a reasonable person would deem . . . *cogent and at least as compelling* as any opposing inference," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). "A court must compare the malicious and innocent inferences

14

cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Id.* at 991. When assessing scienter, a "court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002); *see also Tellabs*, 551 U.S. at 323–24.

"[M]ere recklessness" is insufficient to plead scienter. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 619 (9th Cir. 2017). To meet the high bar for pleading scienter based on recklessness, a plaintiff must allege "specific facts indicating no less than a degree of recklessness that *strongly suggests actual intent*." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (emphasis added).

Plaintiffs nowhere even argue that the inference of fraudulent intent is at least as compelling as any other inference and, indeed, Plaintiffs' theory "does not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). This Court should affirm.

## A. Defendants' Own Statements And Access To Information Undermine Any Inference Of Scienter

Plaintiffs' err in relying (Br. 54–59) on Defendants' "own words" and access to information in arguing Plaintiffs have adequately alleged scienter because such facts fail to meet the applicable legal standard.

15

1.     Defendants' Risk Disclosures Contradict Any Inference Of Scienter

As this Court has "reasoned in an analogous circumstance, the 'detailed risk disclosure negates an inference of scienter.'" *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007) (alteration adopted) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994)).   Here, as the district court found—and as Plaintiffs do not challenge on appeal—Tesla provided detailed risk warnings and cautionary language throughout the Class Period.

Risk disclosures, made in Tesla's Class Period SEC filings, specifically identified the risk at issue here—that the development of FSDC would not proceed as quickly as planned—as the district court explained.  *See* 1-ER-16.   Tesla expressly warned that it may "*experience . . . delays in launching . . . future features and services such as new Autopilot or FSD features* and the autonomous Tesla ride-hailing network" (2-ER-290) (emphasis added) and further that if its "products contain design or manufacturing defects that cause them not to perform as expected or that require repair, or *certain features of our vehicles such as new Autopilot or FSD features take longer than expected to become enabled*, . . . our ability to develop, market[,] and sell our products and services may be harmed" (2-ER-294) (emphasis added).[4]   Tesla also warned of risks that its software was

---

[4]    *See also* 2-ER-316 ("For example, we are developing self-driving and driver assist technologies to rely on vision-based sensors . . . . *There is no guarantee that*

16

"inherently complex and may contain latent defects or errors" and that efforts to remedy those issues "*may not be timely*." 2-ER-294 (emphasis added).

Beyond that, as the Complaint alleges, Musk himself acknowledged that he had "never really seen more kind of false dawns, or where it seems like we're going to break through but we don't, as I've seen in full self-driving." 3-ER-354. Because Musk and Tesla repeatedly disclosed these risks to investors, these sufficient disclosures contradict Plaintiffs' allegations of scienter. *In re Bank of Am. AIG Disclosure Sec. Litig.*, 566 F. App'x 93, 94 (2d Cir. 2014) (no scienter where more compelling inference was "defendants did not think there was any need for public disclosure" in light of, among other things, existing disclosures).

Such disclosures strongly indicate that Defendants lacked any fraudulent intent. As the district court held in addressing certain misstatements, the disclosure language "precisely addresse[d] the alleged misrepresentations." 1-ER-16. "Disclosing the precise risks at issue negates an inference of scienter." *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1160 (S.D. Cal. 2008) (alteration adopted) (quotation marks omitted). Here, such disclosures directly contradict any inference of fraudulent intent.

---

*any incremental changes in the specific equipment we deploy in our vehicles over time will not result in initial functional disparities from prior iterations or will perform as expected in the timeframe we anticipate, or at all.*" (emphasis added)).

17

2. <u>Neither Defendants' Own Statements Nor Access To Information Satisfies The Legal Test For Pleading A Strong Inference Of Scienter</u>

Nor are Plaintiffs correct (Br. 54–59) that access to information and Defendants' own statements support a strong inference of scienter.

Contrary to Plaintiffs' argument (Br. 55–56) that allegations of hands-on management need not "be tied to specific information," courts routinely hold that such allegations are insufficient to plead scienter. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("Although plaintiffs refer to the existence of the IMS data and make a general assertion about what they think the data shows, plaintiffs do not allege with particularity any specific information showing" the data contradicted defendants' public statements); *Zucco*, 552 F.3d at 1000 (allegations of close review of accounting numbers each quarter insufficient).

In fact, even the authority on which Plaintiffs rely (Br. 54–58) involves more detailed allegations of direct involvement in the specific matters alleged to be misrepresented. *See, e.g.*, *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014)

(defendant "referenc[ed] the data directly" and was thus "not like the CEO of a large enterprise, who may be removed from the details"), *overruled in part on other grounds as recognized in City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (plaintiff alleged top executives admitted "they monitored portions of Oracle's global database" that would have made them aware of revenue recognition of a "significant magnitude"); *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 946 (9th Cir. 2023) (allegations gave rise to inference that CEO was aware of source of $1 billion in revenue because CEO who lacks awareness of this significant fact "is unlikely to exist"); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (holding scienter not adequately alleged and noting requirement for "detailed and specific allegations about management's exposure to *factual information* within the company" (emphasis added)).

Although Plaintiffs argue (Br. 58–59) that Musk "had actual access" to contrary information about FSDC, Plaintiffs do not identify that information. Instead, Plaintiffs merely assert (Br. 59) that Musk "was regularly updated on" FSDC, that Tesla collected data from intersections, and that the company kept documentation of safety issues in a program called Jira. The district court correctly held these vague allegations of updates and data collection fall short of alleging

what "information [Musk] allegedly learned" that was contrary to his public statements. 1-ER-27–ER-28.

Similarly undercutting scienter, Plaintiffs' allegations demonstrate that Tesla employees gave Musk a reason to be optimistic because Tesla "train[ed] its models specifically to perform well" on routes often driven by Musk. *E.g.*, 4-ER-625 ¶ 247. In fact, CW-2 specifically claims he was instructed "to focus on routes" "most driven by Defendant Musk." 4-ER-624 ¶ 246. Rather than supporting scienter, the more plausible inference is that Musk—who is not alleged to have instructed Tesla employees to focus on his routes—personally drove successful trips on his regular routes because his employees focused on those routes, which in turn contributed to his optimism about FSDC.

These allegations also undermine Plaintiffs' argument (Br. 54–58) that Musk "touted his in-depth understanding of Tesla's [FSDC]," and thus must have been aware that his projections for FSDC and statements regarding its safety and capabilities were misleading. As the district court correctly held, "Plaintiffs fail to connect Musk's hands-on management with any information that he allegedly learned rendering his statements false or misleading." 1-ER-27. While Plaintiffs argue (Br. 56 n.11) scienter can be inferred because Musk made certain statements in response to analyst questions, responses to investor questions cannot create a strong inference of scienter absent specific contrary information conveyed to the

defendant. *E.g.*, *Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936, at *12 (N.D. Cal. Mar. 16, 2020) (responses to "repeated questions from analysts" do not suffice to plead scienter without facts showing "intentional or conscious misconduct"). Plaintiffs' cited authority (Br. 56 n.11) does not hold otherwise. *See In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (scienter adequately alleged where plaintiff pled, among other things, defendants "continued to deny" issues, "even after regulators raised concerns" to them).

Plaintiffs also are wrong to complain (Br. 57–58) that the district court failed to credit allegations regarding the DMV Letters. Plaintiffs' Complaint quotes the DMV Letters, which are specific to the City Streets feature, not FSDC as a whole. 4-ER-619–ER-620 ¶¶ 227–30. Tesla's website and marketing materials make clear that City Streets is a single feature within Tesla's FSD system. 2-ER-204. Plaintiffs' assertion (Br. 58) that Tesla's whole system "ran on the same machine learning based model" does not mean the City Streets feature reflected the capabilities of the entire system, which was made up of several different features. As the district court concluded, "Plaintiffs have not alleged that statements about City Streets technology applied to all of Tesla's ADT, and Tesla was equivocal in whether it could achieve Level 5 autonomy by the end of the year." 1-ER-27.

Moreover, far from demonstrating that Musk acted with intent to defraud, the DMV Memo—which Plaintiffs describe as their "most damning" evidence—actually demonstrates Musk's transparency with investors. Specifically, the DMV Memo explains that Musk's predictions were based on "extrapolating on the rates of improvement" (4-ER-621 ¶ 232), which is consistent with his statement to investors that his projections were "based on my understanding of the technical road map and the progress that we're making between each beta iteration" (4-ER-657 ¶ 357).

### 3. The Allegations Do Not Satisfy The Core Operations Theory

In this same vein, Plaintiffs are wrong to argue (Br. 65–66) that Musk must have been aware that his projections regarding FSDC were unrealistic simply because achieving autonomous driving was "essential" to Tesla's business. Plaintiffs' allegation that self-driving was touted as "essential" (4-ER-572 ¶ 56) fails to plead the facts necessary for a core operations theory. *See, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (rejecting core operations theory even when "the problem concerned [NVIDIA's] flagship product and was cause for concern to [NVIDIA's] two largest customers" (alterations in original)).

Recognizing as much, Plaintiffs argue (Br. 66) that it would be "absurd" to suggest Musk was unaware of the details of the timeline for various FSDC

features. But this is not one of the "exceedingly rare" cases, *S. Ferry*, 542 F.3d at 785 n.3, in which a company misstated "a fact of such prominence that it would be 'absurd' to suggest that management did not know about it," *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1112 (9th Cir. 2021). *Cf. Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–89 & n.5 (9th Cir. 2008) (core operations satisfied because "stop-work" orders from largest customers halted millions of dollars of work and had "devastating effect" on revenue). Rather, Musk's statements concerned predictions and estimates for highly complex state-of-the art technology that was evolving and being developed on a daily basis. *See In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *24 (N.D. Cal. Mar. 31, 2023) (rejecting allegation that "Intel's 7nm development was of great importance to the company and to investors"), *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024).

Nor do Plaintiffs allege that Musk was involved in the minutiae of the timeline for specific benchmarks in self-driving, instead relying on general statements from Musk that self-driving was important and allegations that Musk "use[d]" the "technology himself." Br. 66. "Pointing to Defendants' statements . . . does not suffice under this theory" and cannot substitute for "specific admissions of detailed involvement." *In re Nektar Therapeutics*, 2020 WL 3962004, at *12 (N.D. Cal. July 13, 2020) (alteration adopted); *see also Iron Workers*, 2020 WL 1244936, at *11 (core operations requires admissions of

"Individual Defendants' detailed involvement with this level of secondary data, as opposed to higher-level information").[5]

The district court properly rejected Plaintiffs' core operations theory because "Plaintiffs do not show what information showed that Musk knew that his predictions about the timeline of FSD development, its capabilities, or its safety were false or misleading." 1-ER-28. Proceeding under a core operations theory is "not easy." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Plaintiffs "must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring; or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.* (citation omitted). Plaintiffs allege neither.

4.    The Confidential Witness Allegations Do Not Cure The Insufficient Scienter Allegations

Finally, Plaintiffs err in relying (Br. 59–65) on the flawed CW allegations.

To start, even Plaintiffs contend (Br. 59) that the CW allegations only show that "Musk was regularly updated on the status of the technology." That is insufficient as a matter of law, as the district court correctly held. 1-ER-25–ER-27.

---

[5]    By contrast, Plaintiffs' cited cases (Br. 66) concern "contemporaneous documents demonstrating management's awareness of the company's non-compliance" issues, *Reese*, 747 F.3d at 579–80, and allegations of "specific information conveyed to management and related to the fraud," *S. Ferry*, 542 F.3d at 785.

That witnesses, as Plaintiffs assert (Br. 60), were in a position to know relevant information is only part of the inquiry. *Intuitive Surgical*, 759 F.3d at 1063 (CW failed to "detail the actual contents of the reports the executives purportedly referenced or had access to," and witnesses "lack[ed] first hand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health").

That is the particularly the case as to CW-1, who worked at Tesla for only six months of the Class Period. 4-ER-622 ¶ 236; *Nguyen*, 962 F.3d at 416 (noting "ample basis to question aspects of CW1's claimed knowledge" when "[m]any of the statements that plaintiff alleges are false and misleading were made after CW1 left" the company). As the district court concluded (1-ER-26), CW-1's allegations that "accident and safety data was reviewed by Tesla" (4-ER-622 ¶ 237) and that there were errors in Tesla's autopopulated images (4-ER-623 ¶ 240) do not specify what contrary information Musk or Tesla had at the time of any purported misstatement. *Intuitive Surgical*, 759 F.3d at 1063.[6]

Nor are Plaintiffs correct to argue (Br. 61–62) that the district court erred because CW-2 was described with sufficient particularity to support the idea that

---

[6] Plaintiffs' authority (Br. 63 n.15) is distinguishable. *NVIDIA*, 81 F.4th at 939 (allegations of personality traits pre-class period were relevant to traits during class period); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (finding it unnecessary for plaintiffs to allege CWs worked for defendant company for entirety of class period).

CW-2 had the information alleged. Even accepting that allegations of CW-2's role suffice to infer he knew what "everyone" in the department thought about Tesla's FSD technology (Br. 62), hearsay allegations about what "everyone" knew cannot plead scienter. 1-ER-26; *see Espy v. J2 Glob., Inc.*, 99 F.4th 527, 537 (9th Cir. 2024) (rejecting CW allegations that "rel[y] on secondhand information" and constitute "general allegations" that "lack reliability and personal knowledge"); *Zucco*, 552 F.3d at 996–1000 (declining to credit CWs "report[ed] only unreliable hearsay").[7] Such allegations say nothing about what *Musk* knew or when. CW-2 therefore lacks "reliable personal knowledge of the defendants' mental state." *Zucco*, 552 F.3d at 998; *see Intuitive Surgical*, 759 F.3d at 1062 (rejecting "impressions of witnesses who lacked direct access to the executives"); *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 601 (9th Cir. 2014) ("[T]here is no allegation that any CW relayed this information to any defendant."); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021). Likewise, allegations about what "would have" been reported to Musk are speculative and cannot create a strong inference of scienter.[8] *See, e.g., Zucco*, 552 F.3d at 998 (allegation that individual

---

[7]   Plaintiffs' cited authority (Br. 62 n.14) dealt with much more specific allegations, in which the CW identified the source of the information by name. *See Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 & n.5 (9th Cir. 2019).

[8]   This case is unlike Plaintiffs' authority (Br. 64), *Robb v. Fitbit Inc.*, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017), in which a CW reported specific information to

defendant "had to have known what was going on" is a "generalized claim[] about corporate knowledge [that is] not sufficient to create a strong inference of scienter").

On the whole, the district court correctly found these allegations did not raise a strong inference of scienter because Plaintiffs did not allege what information was reflected in the reports or when, or who attended the relevant meetings, when they occurred, or what was said, and "without more specificity, it cannot find that Musk's receipt of unspecified reports and updates from the engineering team are indicative of a strong inference of scienter." 1-ER-26. This is a correct application of well-established law in this Court, which requires more detail regarding the allegedly contrary information received by a defendant. *See, e.g.*, *Nguyen*, 962 F.3d at 417 ("[W]hile CW1 references a 'stream of complaints and incident reports' and a general concern that these reports supposedly caused, the complaint does not plead any details about these reports that would demonstrate a strong inference of scienter[.]"); *Intuitive Surgical*, 759 F.3d at 1063.

### B. The Allegations In The Complaint Contradict Any Motive Theory

Equally implausible—and thus not supportive of a compelling inference of scienter—is Plaintiffs' argument (Br. 67–70) that Musk lied to investors starting in 2019 so that he could sell Tesla stock to purchase Twitter in 2022.

---

an individual who the CW believed reported that information to defendant. *Id.* at *6 & n.6.

"[E]vidence of a personal profit motive on the part of officers and directors . . . is insufficient to raise a strong inference of scienter." *Magistri*, 549 F.3d at 748. To determine whether stock sales contribute to the scienter calculus, courts consider: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Zucco*, 552 F.3d at 1005.

Here, the district court correctly rejected Plaintiffs' allegations as insufficient, noting that "the stock sales (over a four-year period) were not linked to any purported misstatement or corrective disclosure, and the timing of [the] sales undermines any inference of scienter." 1-ER-29.

*First*, Plaintiffs contest (Br. 67–68) the district court's holding that "[g]iven the timing of the sales, any inference of scienter from the higher sale of stocks is not a strong inference" (1-ER-30), arguing the timing of sales was suspicious because they occurred when the stock price was high. But Plaintiffs point to no authority that the timing of stock sales is suspicious because the price happened to be high. Rather, as the district court properly ruled (1-ER-30), courts consider whether the timing was suspicious *in the context of the alleged fraud*—that is, if sales occurred right after an alleged misstatement inflated the price or right before a corrective disclosure. *See, e.g.*, *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) ("Context is important, especially for assessing the weight to

attach to the timing of the sales."), *abrogated in part on other grounds by Tellabs*, 551 U.S. 308 (2007).

All of the stock sales on which Plaintiffs rely occurred *after* the first two corrective disclosure (*see* 4-ER-699–ER-738), which adds nothing to the scienter calculus. This is particularly true given the fact that Plaintiffs have alleged a ***four-year*** class period. 4-ER-557. Stock sales over such a lengthy period of time must be specifically linked to the alleged fraud. *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *35 (C.D. Cal. Apr. 14, 2015) (stock sales during long class period unrelated to misrepresentations do not contribute to scienter calculus).

In fact, Plaintiffs do not allege a single stock sale by Musk for more than *two years* after the first alleged misstatement and eight months after it became widely publicized that the City Streets feature would not exceed Level 2 autonomy before being released to the general public. *See Lapiner v. Camtek, Ltd.*, 2011 WL 445849, at *7 (N.D. Cal. Feb. 2, 2011) (rejecting motive allegation where "all of the alleged sales occurred more than five months after the alleged misstatements began"). Further, the first stock sale occurred *after* the first two alleged corrective disclosures and the purported "most damning" evidence of fraud (the DMV Memo

29

and Letters) were public.[9] *Hoang v. Contextlogic, Inc.*, 2023 WL 6536162, at \*26 (N.D. Cal. Mar. 10, 2023) ("Sales after corrective disclosures do not support an inference of scienter."). Thus, the timing of the sales actually undermines an inference of scienter.

*Second*, Plaintiffs again themselves identify (Br. 68) an innocent explanation for Musk's stock sales: his purchase of Twitter. "This innocent, alternative explanation for the stock sales negates an inference of scienter." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012). Plaintiffs' attempt to neutralize this compelling alternate inference by arguing that Musk had motive to artificially inflate the stock price to make increased profit from his sales is no different from general allegations of a motive to sell shares at a high price to profit, which are routinely rejected. *E.g.*, *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (motive to boost stock price is "routine corporate objective[]" that cannot establish scienter). This allegation thus supports an opposing, non-culpable inference that Musk sold stock not to benefit from any alleged fraud, but to fund his purchase of Twitter.

---

[9] Plaintiffs argue (Br. 68 n.18) the district court erred in finding Musk "sold his first stocks after the two alleged corrective disclosures" (1-ER-29) because Plaintiffs allege five corrective disclosures. But it is correct that Musk sold only after the first two corrective disclosures. The conclusion is not an error due to a single missing word.

Plaintiffs' theory—that Musk lied to investors starting in 2019 so that he could sell Tesla stock to purchase Twitter in 2022, and waited to sell until Tesla missed projected timelines, after disclosure of the "most damning" evidence of falsity was disclosed, and after multiple alleged corrective disclosures—"does not make a whole lot of sense." *Nguyen*, 962 F.3d at 415 (scienter not adequately alleged absent motive for company to hide issues that eventually would come to light).

*Third*, the district court properly rejected Plaintiffs' argument (Br. 68) that Musk was incentivized to inflate the stock price because he had a loan collateralized by his Tesla shares. Courts routinely reject this argument. *See, e.g.*, *Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 114 (D. Conn. 2005) (CFO's pledge of company stock as collateral insufficient to establish motive because "loans secured with stock are analogous to stock ownership"). Indeed, this precise argument already has been rejected when made against Musk himself in prior litigation. *See Bao v. SolarCity Corp.*, 2015 WL 1906105, at *2 (N.D. Cal. Apr. 27, 2015) (scienter insufficiently pleaded even with allegations that Musk had pledged the company's stock to secure a loan).

## C. The District Court Correctly Held That, As A Whole, Plaintiffs' Allegations Fail To Plead Scienter

As the district court correctly held—and as Plaintiffs do not address— Plaintiffs' theory of scienter and supporting allegations "do[] not make a whole lot

of sense." 1-ER-31 (quoting *Nguyen*, 962 F.3d at 415).   Like in *Nguyen*, Plaintiffs rely on the "supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout," *id.* (quoting *Nguyen*, 962 F.3d at 415), but any allegations for doing so are missing.   Not only is a timing link between significant stock sales and misstatements missing, but the compelling inference drawn from Defendants' disclosure of the precise risk that materialized outweigh any potential inference of fraudulent intent.   And the identified alternate reason for Musk's stock sales—funding his purchase of Twitter—similarly outweighs the speculative idea that Musk sought to sell stock to benefit from the misstatements— misstatements alleged to have started years earlier.

In the absence of allegations indicating more than that "Defendants were generally aware that various issues existed" (1-ER-30), Plaintiffs resort to speculative arguments (Br. 69–70) that unrelated misstatements on a different topic or "staging" videos made before the Class Period could support an inference that Musk made knowing misrepresentations during the Class Period.   The district court correctly rejected this argument (1-ER-30), and this Court should as well. Plaintiffs cannot articulate how Musk's participation in promotional videos in 2014 and 2016 (4-ER-576–ER-577 ¶¶ 69–70; 4-ER-679 ¶ 422) demonstrates Musk's awareness that his statements years later were false.   The only allegation regarding the 2014 video is that Musk took his hands off the wheel and said "[n]o hands."   4-

32

ER-577 ¶ 70.  And any efforts to improve the technology behind the scenes before the 2016 video, which pre-dates the Class Period by three years, says nothing about the capabilities of the rapidly evolving technology years later or Musk's knowledge of the same.  *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535, at *27 (N.D. Cal. Mar. 9, 2007) ("[A]llegations relating to inventory management prior to the class period do not show defendants' scienter with regard to statements made during the class period.").

Nor do Plaintiffs articulate any connection between the present cases and another court's summary judgment finding that Musk's "funding secured" tweet (related to an effort to take Tesla private) was misleading.  4-ER-679–ER-680 ¶ 423.  A prior finding about a tweet entirely unrelated to this case (for which a jury found Musk and Tesla not liable) is irrelevant to whether any of these statements on a different subject were made with scienter.  *See, e.g.*, *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 400–01 (S.D.N.Y. 2022) (absent link to alleged misstatements, "allegations about other actions or wrongs do not support an inference" of scienter).

Plaintiffs' only proffered authority (Br. 70) does not suggest that unrelated conduct can give rise to an inference of scienter and instead merely observes that allegations should be considered holistically.  *S. Ferry*, 542 F.3d at 784. Considered as a whole, Plaintiffs' Complaint does not satisfy the requirement to

"plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference," *Tellabs*, 551 U.S. at 323, that "a reasonable person would deem . . . *cogent and at least as compelling* as any opposing inference," *Zucco*, 552 F.3d at 991.

## II. THE JUDGMENT SHOULD BE AFFIRMED BECAUSE THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS DID NOT PLEAD A FALSE OR MISLEADING STATEMENT

This Court also should affirm the judgment dismissing the Section 10(b) claim because Plaintiffs failed to plead any actionable and materially false or misleading statement, as the district court correctly held. Under the PSLRA, "a securities fraud complaint must specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *CheckOut Holdings, LLC v. Amplified Holdings, Inc.*, 64 F. App'x 631, 632 (9th Cir. 2003) (quotation marks omitted). The alleged misstatements are a combination of forward-looking statements protected by the PSLRA Safe Harbor, truthful statements of opinion and fact, and inactionable puffery, and Plaintiffs otherwise fail to identify any contemporaneous facts rendering the statements false or misleading when made.

### A. The District Court Correctly Ruled Defendants' Forward-Looking Statements Are Inactionable

Plaintiffs on appeal challenge (Br. 43 & n.6) the application of the PSLRA's Safe Harbor to nine statements. But each of these alleged misstatements concerns

forward-looking projections of what FSDC will be capable of and when. The district court correctly ruled that these statements are protected by the PSLRA Safe Harbor, either due to the inclusion of meaningful cautionary language or because Plaintiffs did not allege facts sufficient to plead actual knowledge of falsity. 1-ER-9–ER-17.

      1.    <u>Defendants' Projections For FSDC's Development Are Forward-Looking Statements</u>

At the threshold, the district court determined that seventeen statements were protected by the Safe Harbor. *Id.* Plaintiffs do not challenge that ruling as to many of the statements (Br. 43 n.6), thus agreeing that those statements fall with the Safe Harbor and waiving any argument to the contrary. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) (argument not raised in opening brief is waived).

As to the statements Plaintiffs argue (Br. 43–46) should result in reversal, the district court correctly concluded (1-ER-11–ER-13) such statements are forward-looking statements protected by the PSLRA Safe Harbor because each concerns future operations. As a general matter, forward-looking statements concern "plans or objectives relating to the products or services." 15 U.S.C. § 78u-5(i)(1)(B). "Because any announced 'objective' for 'future operations' *necessarily* reflects an implicit assertion that the goal is achievable based on current circumstances, an unadorned statement that a company is 'on track' to achieve an

announced objective . . . [is] merely [an] alternative way[] of declaring or reaffirming the objective itself." *Wochos*, 985 F.3d at 1192.

Here, each of the statements that Plaintiffs seek to reinstate as a basis for its Section 10(b) claim refers to a projected timeline for achieving a future goal. 4-ER-642–ER-643 ¶ 313 ("this year"); 4-ER-643 ¶ 315 ("this year" and "end of next year"); 4-ER-644 ¶ 317 ("By the middle of next year"); 4-ER-646 ¶ 323 ("this year"); 4-ER-651 ¶ 339 ("this year"); 4-ER-652 ¶ 343 ("by the end of this year"); 4-ER-654 ¶ 349 ("next year"); 4-ER-655 ¶ 351 ("next year"); 4-ER-656 ¶ 353 ("this year").[10]

Seeking to avoid this conclusion, Plaintiffs reiterate (Br. 43–44) their rejected argument that the forward-looking statements omitted a present fact. As the district court explained, however, a statement contains non-forward-looking assertions only if it "goes beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion containing a specific '*current or past fact*.'" 1-ER-12 (emphasis added) (citing *Wochos*, 985 F.3d at 1191); *see also In re Intel Corp. Sec. Litig.*, 2024 WL

---

[10] Although Plaintiffs argue that the Safe Harbor ruling did not apply to the statements in paragraphs 323 and 343 of the Complaint (Br. 43 n.6), the district court's opinion indicates that it does apply (1-ER-11). In any event, nothing distinguishes these statements from the ones to which the district court indisputably determined the Safe Harbor applies.

1693340, at *1 (9th Cir. Apr. 19, 2024) (statements that "timeline" for product were "unchanged" and "on track" were inactionable forward-looking statements).

Statements such as "I think we will be feature complete full self driving this year" (4-ER-642–ER-643 ¶ 313) and "Tesla Full Self-Driving will work at a safety level well above that of the average driver this year" (4-ER-656 ¶ 353) do not reflect any assertions of current or past fact. For this reason, Plaintiffs' authorities (Br. 43)—which concern misstating prior revenue in making future projections, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1021 n.15 (N.D. Cal. 2020), and misrepresenting an existing tax authority ruling, *Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1225 (C.D. Cal. 2017)—do not call into question the district court's conclusion.

Nor can Plaintiffs avoid this conclusion by arguing (Br. 44–46) that certain projections were "framed as guarantees or certainties, rather than projections." Even when projections are made with optimism and confidence, that does not put them outside the reach of the Safe Harbor. *Wochos*, 985 F.3d at 1195 (holding protected as forward looking statement that "we are *confident* we can . . . achieve a run rate of 5,000 vehicles per week by the end of 2017" (emphasis added)). For this reason, not even Plaintiffs' authority (Br. 44–45) holds that projections made with certainty are actionable. *See In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (rejecting argument that projections were guarantees

37

because "it would be unreasonable for the market to have interpreted the statements at issue as anything other than an individual's prediction about the future"); *Emps. Ret. Sys. of City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 389 (4th Cir. 2023) (finding statement that company anticipated positive trend would continue to be inactionable forward-looking statement); *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) (growth projections inactionable).

### 2. The Statutory Exclusion Does Not Apply

Plaintiffs also err in arguing (Br. 50–53) that Tesla cannot invoke the Safe Harbor because it was subject to an October 16, 2018 order barring the company from violating Rule 13a-15.[11]

The Safe Harbor exclusion on which Plaintiffs rely applies only if the issuer has been the subject of a governmental action from which an order barring violations of *antifraud* provisions of the securities laws arose. *See* 15 U.S.C. § 78u-5(b)(1)(A)(ii). As the district court correctly held, "Rule 13a-15 does not make any reference to the speaker's state of mind," and thus it "cannot find that Rule 13a-15 is an antifraud provision," meaning that Tesla still could invoke the protections of the PSLRA Safe Harbor. 1-ER-10. Indeed, Plaintiffs do not even

---

[11] Plaintiffs do not argue the similar order that Musk received is relevant, nor could they, because Musk is not an issuer (*see* 15 U.S.C. § 78c(a)(8)).

appeal numerous statements to which the district court held the Safe Harbor applies. *Compare* Br. 43, *with* 1-ER-16.

None of the cases on which Plaintiffs rely (Br. 50–53) hold that Rule 13a-15 or any similar Rule is an antifraud provision. That is because Rule 13a-15 dictates only that issuers of securities must maintain "disclosure controls and procedures" and evaluate their effectiveness every quarter. 17 C.F.R. § 240.13a-15(a)–(b). The Rule defines "disclosure controls and procedures" to mean controls and procedures "designed to ensure that information required to be disclosed by the issuer . . . is recorded, processed, summarized[,] and reported" in a timely manner. *Id.* § 240.13a-15(e). The issuer must also evaluate "internal control over financial reporting" every fiscal year. *Id.* § 240.13a-15(c)–(d), (f). Such provisions do not address intentional wrongdoing and thus are not antifraud provisions. *See, e.g.*, *S.E.C. v. McNulty*, 1996 WL 422259, at *7 (S.D.N.Y. July 29, 1996) ("Section 13(a), like § 13(d)(1), is a reporting, and not an anti-fraud, provision[.]"); *see also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1325 (11th Cir. 2019) (Rule 12b-20 not antifraud provision given lack of scienter requirement).

Nor are Plaintiffs correct to argue (Br. 50–51) that Rule 13a-15 qualifies as an antifraud provision because it was promulgated when implementing the Sarbanes-Oxley Act. As the district court explained, "[i]n promulgating Rule 13a-15, the SEC did not discuss any fraud or state of mind requirements for the rule"

39

(1-ER-10) and instead "explained that '[p]roposed Rule 13a-15 would require a company to maintain sufficient procedures to collect, process and disclose the information required in its periodic and current reports filed with the Commission'" (*id.* (quoting *In Re Certification of Disclosure in Companies' Q. & Ann. Reps.*, SEC Release No. 46079 (June 14, 2002))). In arguing that the SEC referred to the disclosure rules as an expansion of "existing antifraud" rules, Plaintiffs once again (Br. 51) "misquote[] the SEC Release, which refers broadly to 'existing antifraud *and disclosure rules*.'" 1-ER-10 n.7 (emphasis added) (quoting SEC Release No. 46079, at *2).

Plaintiffs fall back (Br. 51–52) to the position that not all "antifraud provisions" require fraudulent intent, citing provisions of the Securities Act. But, as Plaintiffs' authority recognizes, the Securities Act is plainly an antifraud statute because it "forbid[s] making a material misstatement or omission in connection with the offer or sale of a security." *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). And Plaintiffs' argument (Br. 52) that the exclusion was meant to apply to issuers subject to an order "involving a violation of the securities laws," not specifically an antifraud provision, only underscores that such an interpretation is not correct because it would render every component of the securities laws an antifraud provision subject to the Safe Harbor's exclusion, contradicting the text of the statute.

3.     <u>The Earnings Call Statements Are Accompanied By Cautionary Language</u>

Plaintiffs err in implying (Br. 43 & n.6) that the forward-looking statement from the earnings call in paragraph 343 of the Complaint—which specifically speaks to confidence that FSDC will be "complete by the end of this year" (4-ER-652 ¶ 343)—does not qualify for Safe Harbor protection.

Statements accompanied by "meaningful cautionary language," 15 U.S.C. § 78u-5(c)(1)(A)(i), qualify for protection under the Safe Harbor. Here, all statements made during earnings calls were accompanied by cautionary language that incorporated the detailed risk disclosures in Tesla's SEC filings. *See infra*, at 42; *Intuitive Surgical*, 759 F.3d at 1058 ("safe harbor applies if the forward-looking statement is [] identified as a forward-looking statement[] and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" (quotation marks omitted)).

As Plaintiffs effectively recognize in not challenging the Safe Harbor ruling as to the remainder of the earnings call statements, those calls contain sufficient cautionary language to fall within the protection of the Safe Harbor. Each earnings call began with a warning that "[d]uring this call, we will discuss our business outlook and make forward-looking statements," which "are based on our predictions and expectations as of today. Actual events or results could differ

41

materially due to a number of risks and uncertainties, including those mentioned in our most recent filings with the SEC." 3-ER-352; 3-ER-372; 3-ER-389; 3-ER-406; 3-ER-424; 3-ER-439; 3-ER-455. Plaintiffs call (Br. 47–48) these warnings "generic" and "unspecific," but this language is precisely what the PSLRA requires on earnings calls—a warning that results may differ or for the company to direct investors to risk disclosures in the company's SEC filings. 15 U.S.C. § 78u-5(c)(2).

Tesla issued several risk disclosures in its Class Period SEC filings specifically concerning the timing for the release of its FSDC technology. *See supra*, at 16–17 (quoting 2-ER-290; 2-ER-294).[12] Tesla specifically warned of risks that its software was "inherently complex and may contain latent defects or errors" and that efforts to remedy those issues "*may not be timely*." 2-ER-294 (emphasis added).

The district court cited to this exact language, which it concluded "precisely addresses the alleged misrepresentations." 1-ER-16. As the district court held, "courts have recognized that language similar to Defendants' is sufficiently cautionary." *Id.* (collecting cases); *see also In re Cutera Sec. Litig.*, 610 F.3d

---

[12] *See also* 2-ER-316 ("For example, we are developing self-driving and driver assist technologies to rely on vision-based sensors . . . . *There is no guarantee that any incremental changes in the specific equipment we deploy in our vehicles over time will not result in initial functional disparities from prior iterations or will perform as expected in the timeframe we anticipate, or at all.*" (emphasis added)).

1103, 1112 (9th Cir. 2010) (cautionary language warning that company's "ability to continue increasing sales performance worldwide" specifically due to attraction and retention of marketing personnel could cause variance in results sufficient to warn of risk of insufficient sales staff); *Intuitive Surgical*, 759 F.3d at 1056 (cautionary language warning that economic downturn may result in reduced sales and revenues sufficient to warn of risk of growth rate decline).[13]

Plaintiffs are wrong to argue (Br. 48–49) these warnings were inadequate because there was "no real chance" Tesla would be able to release Level 4-5 technology within the projected timeline. As the district court found, Plaintiffs did not allege such facts in the Complaint (1-ER-15–ER-16), and they elected not to amend their Complaint to address this deficiency (2-ER-37).

In any event, Plaintiffs conflate Tesla's intention to develop higher level features in general and its statement that the *City Streets* feature specifically would not reach higher levels of autonomy before being released from beta testing to the general public. *See supra*, at 21–22. The district court thus properly concluded that "Plaintiffs have failed to point to allegations showing that the risk that the FSD

---

[13]   The direct connection between the cautionary language and the subject of Plaintiffs' allegations distinguishes Tesla's cautionary language from that in Plaintiffs' authority (Br. 48). *See Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (boilerplate warnings regarding reduced sales due to supply chain disruptions insufficient to warn of known risk that product would be unappealing to purchasers).

technology could not be achieved by the projected timeline had 'already come to fruition.'" 1-ER-15–ER-16.[14]

### 4. The Bespeaks Caution Doctrine Protects All Defendants' Forward-Looking Statements

Plaintiffs' attempts to pursue the forward-looking statements made outside of earnings calls fare no better because the Bespeaks Caution Doctrine protects those statements given the cautionary language that the district court found was meaningful.

"Courts have not required that the cautionary language be in the same document as the allegedly false or misleading forward-looking statement." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *10 (N.D. Cal. Sept. 29, 2000); *see also Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir. 2004) (rejecting argument that "only cautionary language actually accompanying the false statements can be considered as a defense" and considering SEC filing's cautionary language even though alleged misstatement occurred during conference call); *In re Allied Nev. Gold Corp.*, 2016 WL 4191017, at *9 (D. Nev. Aug. 8, 2016) (collecting other cases).

---

[14] This distinguishes the present case from Plaintiffs' authority (Br. 49). *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (cautionary language regarding risks that "could" arise insufficient where risks already materialized); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (similar).

The Bespeaks Caution Doctrine renders all Defendants' forward-looking statements inactionable because they must be read in conjunction with the cautionary language in Tesla's earnings calls and SEC filings.[15] *See Intuitive Surgical*, 759 F.3d at 1059 (Bespeaks Caution Doctrine protects forward-looking statements when cautionary language was in the company's SEC filings). Contrary to Plaintiff's assertion (Br. 47–49), courts routinely dismiss alleged misstatements where they are protected by the Bespeaks Caution Doctrine due to cautionary language in the company's SEC filings and other disclosures. *E.g.*, *Splash*, 2000 WL 1727377, at *9–11; *In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *11–14 (N.D. Cal. Mar. 31, 2014).

Plaintiffs argue (Br. 47 n.7) that these statements are actionable because Tesla's cautionary language did not make it such that "reasonable minds could not disagree that the challenged statements were not misleading," but Plaintiffs waived this argument by failing to respond to this argument at all below. *See United States v. Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1172 (9th Cir. 2017) (argument not raised below waived). Here, Tesla's cautionary language, unlike the cases on which Plaintiffs rely (Br. 47 n.7), warns directly of the technological development risks at issue.

---

[15] The district court did not reach this argument because it found Plaintiffs failed to allege any statement was made with actual knowledge of falsity. 1-ER-17 n.13.

5.      <u>Plaintiffs Fail To Allege Actual Knowledge Of Falsity</u>

Separately, because Plaintiffs failed to plead scienter for any statements (*see supra*, at 14–34), Plaintiffs' cursory argument (Br. 50) cross referencing its scienter argument does nothing to undermine the district court's holding that the separate "actual knowledge" prong of the Safe Harbor applies to the forward-looking statements. 1-ER-17. Thus, even if Defendants' statements were not protected under the Safe Harbor by the accompanying language or the Bespeaks Caution Doctrine, the Safe Harbor still applies because Plaintiffs failed to plead that Defendants had actual knowledge of falsity at the time the statements were made. *See also Cutera*, 610 F.3d at 1112 ("actual knowledge" and "cautionary language" safe harbor prongs are disjunctive).

## B.      The District Court Correctly Held That The Timeline Statements Are Not False Or Misleading

In attacking dismissal of the Section 10(b) claim based on the remaining Timeline Statements, Plaintiffs wrongly contend (Br. 38) that "Defendants repeatedly misrepresented the status of Tesla's ADT by assuring the market that Tesla was on the cusp of releasing Level 4-5 autonomy" even though none of the Timeline Statements make such a factual assertion.

*First*, Plaintiffs' reliance (Br. 41–42) on Musk's statements in interviews and Twitter posts about his prediction of further advancements in the technology were merely statements of opinion—not fact. Opinion statements do not give rise

to Section 10(b) liability because they are not subject to objective verification. *Wochos*, 985 F.3d at 1189. This Court has recognized "substantial limits" to asserting securities claims for these "statement[s] of honest opinion." *Id.* at 1188–89 (emphasis omitted). Opinions are actionable only if the statement is not genuinely believed, there is no reasonable basis for that belief, or the speaker is aware of undisclosed facts that seriously undermine the accuracy of the statement. *City of Dearborn*, 856 F.3d at 614.

Plaintiffs allege no facts establishing that Defendants' opinions set forth in the Timeline Statements were not subjectively held and offer only speculation and vague CW statements with no link to Musk. This is critical because "it is the facts known to, and the intent of, the maker of the statements which is ultimately relevant when the Court considers the falsity of statements of belief or opinion." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

*Second*, Plaintiffs' argument that Musk's "repeated claims" of imminent FSDC release were misleading (Br. 41–42) boil down to a complaint that Tesla took too long. Plaintiffs cannot explain what contemporary facts rendered Musk's statements false, instead arguing that these statements "strongly support[] the conclusion that [Musk's] statements were utterly unfounded when made." Br. 42. But this is not the standard. *See Metzler*, 540 F.3d at 1070. If anything, Musk's

repeated updates to the market undermine falsity because investors were on notice that Tesla's full release of FSD was taking longer than initially planned. Even Musk himself, in a statement that Plaintiffs specifically highlight (Br. 39), warned of "an uncertain period of time for [] regulatory approval." 4-ER-654 ¶ 349.

Plaintiffs again invoke the DMV Memo, but as explained above (*supra*, at 22), the DMV Memo states *not* that reaching Level 5 by the end of 2021 was impossible, but only that Tesla "couldn't say" for sure whether the developments would reach Level 5 by the end of the year and that Musk's predictions rested on "extrapolating on the rates of improvement." 4-ER-621 ¶ 232. This is consistent with Musk's statement that his projections were "based on my understanding of the technical road map and the progress that we're making between each beta iteration." 4-ER-657 ¶ 357.

Plaintiffs' focus (Br. 39–41) on the DMV Letters does not render these statements false when made. Rather, the DMV Letters state only that City Streets would not achieve higher than Level 2 autonomy before being released to the public, not that Tesla was not continuing to develop more advanced capabilities for FSDC overall. As the district court found (1-ER-15), the fact that City Streets was not intended to reach Level 5 autonomy when released to the general public for the first time does not render false Defendants' statements about working toward full self-driving more broadly. *E.g.*, 4-ER-647 ¶ 327.

In fact, while Plaintiffs repeatedly invoke the DMV Letters as evidence of falsity, calling them the "most damning" (Br. 15) and "most significant" (Br. 34) evidence of falsity—even going as far as to say "Tesla's admission to the CA-DMV alone establishes that Tesla's ADT was not capable of no intervention drives" (Br. 35)—Plaintiffs ignore that this information was public in March 2021 prior to any alleged corrective disclosures. 4-ER-565–ER-566 ¶¶ 28–29.[16] To the extent these admissions demonstrated falsity (they did not), the public was aware of them before the corrective disclosures. *See McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019) (statement not misleading when defendant "discloses exactly what [p]laintiffs claim [defendant] omitted").

*Third*, Plaintiffs point (Br. 42) to their expert to argue that the Timeline Statements were false, but Plaintiffs make no effort to tie their "expert" allegations to the alleged falsity of *any* of Defendants' statements. Nor could they, because Plaintiffs' expert's broad, nonspecific criticisms are inadequate to render any statement false. *See Applestein*, 561 F. App'x at 600 (expert analysis insufficient to meet pleading burden when expert "has no personal knowledge of the facts on which he bases his conclusion"). In any case, Plaintiffs' own expert did not opine

---

[16]    *See also* https://www.thedrive.com/tech/39647/tesla-admits-current-full-self-driving-beta-will-always-be-a-level-2-system-emails.

that it was impossible for Tesla to meet its projected timeline for full FSD release or that Tesla was not working toward that goal throughout the Class Period.[17]

*Fourth*, Plaintiffs' reliance (Br. 42–43) on CWs fails to plead falsity as to any Timeline Statement because the CW reports contains only conjecture. That it was known within Tesla's "autopilot department" that Musk's statements about FSD were "exaggerations" (Br. 42) is simply "too vague to show that Musk's statements were false or misleading," as the district court correctly explained (1-ER-24).

*Finally*, the statement in paragraph 343, beyond being protected under the cautionary language portion of the Safe Harbor, constitutes inactionable puffery, as the district court correctly determined. 1-ER-17–ER-18. "Statements of mere corporate puffery[] [and] vague statements of optimism . . . are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Intuitive Surgical*, 759 F.3d at 1060 (quotation marks omitted); *see also In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017) ("[A]lleged optimistic statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery."), *aff'd*, 756 F. App'x 779 (9th Cir. 2019).

---

[17] Plaintiffs could have opted to amend to add such an allegation, but they did not.

### C. The District Court Correctly Held That The Safety Statements Are Not False Or Misleading

Plaintiffs likewise fail to show any error in the district court's conclusions as to the Safety Statements because "the fact that there were safety issues with the technology does not suggest that it was false or misleading to assert that the technology was safer than regular human driving" and because Plaintiffs did not provide facts establishing contemporaneous falsity.  1-ER-22.

At the threshold, most of the Safety Statements are related to Autopilot, not FSDC, and are inactionable on that basis alone.  *E.g.*, 4-ER-644–ER-645 ¶ 319 ("what we see right now is that ***autopilot*** is about twice as safe as a normal driver on average"); 4-ER-658 ¶ 359 ("Autopilot . . . cuts crashes in half").  Plaintiffs identified no reason for conflating the two products in the face of clear disclosures on Tesla's website that they are different products.  2-ER-203–ER-213; 2-ER-289.

While Plaintiffs assert—without citation—that Defendants stated "the technology was safer than humans" during the Class Period (Br. 29), Plaintiffs do not point to a single statement in which Musk says FSDC by itself is safer than a human.  In fact, as the district court recognized (1-ER-22), Musk never said the technology *alone* is safer than a human.  To the contrary, Musk was clear that Autopilot or FSDC *combined with* a human is safer than a human.  *E.g.*, 4-ER-660 ¶ 367 ("[T]he safety that we're seeing when the car is in FSD mode is actually significantly greater than the safety we're seeing when it is not[.]"); 4-ER-654 ¶

51

349 ("[O]ur statistics already show a massive difference when the car is on autopilot or not on autopilot, it's the safety is much greater even with the current autopilot software."). Musk and Tesla repeatedly cautioned that both Autopilot and FSDC require drivers to remain engaged. *See* 2-ER-203 ("Autopilot and Full Self-Driving Capability are intended for use with a fully attentive driver, who has their hands on the wheel and is prepared to take over at any moment."); 2-ER-218 (similar); 2-ER-231 (similar). Plaintiffs also ignore that Musk's January 26 statement was consistent with his prior statement that Tesla was on a "*path towards* a vehicle that will drive 100% safer than a person." 3-ER-461 (emphasis added).

While Plaintiffs argue (Br. 30) that the high rate of driver interventions demonstrate that FSDC was not "safer than humans," the fact that FSDC may occasionally require driver intervention—whether more or less so than Tesla's competitor products do—does not render FSDC less safe than a human driver, nor does it show it was more dangerous to use FSDC features than to drive without them. *See, e.g.*, *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019) (dismissing claims when plaintiff "fail[ed] to connect the statements with factual allegations that show how the statements were false or misleading when made"). Indeed, Plaintiffs do not allege as false any statements comparing Tesla to its competitors. In any event, the Complaint itself acknowledges these intervention

rates were self-reported and public. 4-ER-564 ¶ 25. The district court correctly concluded that Plaintiffs' allegations could not establish as false statements that using Autopilot or FSDC was safer than not using it. 1-ER-21–ER-23.

Finally, in contending (Br. 31–32) that "research" has exposed deficiencies in FSDC, Plaintiffs criticize the district court for focusing on "allegations drawn from news articles" instead of user "complaints." But no article or anecdotal evidence about car accidents could render any Safety Statements false because isolated incidents are not sufficient to establish falsity under the PSLRA. *See Jedrzejczyk v. Skillz, Inc.*, 2024 WL 1635568, at *1 (9th Cir. Apr. 16, 2024) ("imperfections" in software do not render false statements that software platform "enables" synchronous gaming); *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *2 (C.D. Cal. July 7, 2011) ("[I]t is not necessarily inconsistent to assert that quality is stable or even increasing on the whole, while being aware of a potentially significant defect."). Vague allegations that "safety issues" were "frequent" do not suffice under the PSLRA. *Metzler*, 540 F.3d at 1061 ("By requiring specificity, § 78u–4(b)(1) prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful.").

**D. The District Court Correctly Held That The Capability Statements Are Not False Or Misleading**

Nor can Plaintiffs show any error in the district court's conclusion that the Capability Statements were not false and misleading.

*First*, Plaintiffs are simply wrong to argue (Br. 33) that "Defendants repeatedly told investors that Tesla's [*sic*] had *already* achieved Level 4-5 autonomy" because Musk *did not state* that Tesla "already achieved Level 4-5 autonomy." Instead, Musk stated, *inter alia*, that "[t]he latest build is *capable* of zero intervention drives" (4-ER-653 ¶ 345) (emphasis added) and that Musk drives the alpha build of the latest fully self-driving software and "*many times* I can go through a very complicated series of intersections and narrow roads, without ever touching any of the controls" (4-ER-655 ¶ 351) (emphasis added). Musk stated further that it was "*common* for me to have no interventions on drives that I do . . . it's *more common than not* for the car to have no interventions" (4-ER-656 ¶ 355 (emphases added)), which conveys (at most) that Musk completed zero intervention drives only half the time (and Plaintiffs have not alleged otherwise). Statements that FSDC was *capable* of zero intervention drives do not claim that FSDC *always* achieved zero intervention drives or had reached Level 4-5 autonomy. Indeed, Musk's transparent statement that he sometimes needed to intervene on his drives demonstrates that he was *not* representing to investors that

Tesla had reached Level 4-5. *See* 4-ER-574 ¶ 61 (defining Level 4-5 as "not requir[ing] you to take over driving").

In addressing the actual language of the statements alleged to be false or misleading, the district court correctly determined that the only allegations Plaintiffs set forth to support the falsity of these statements "bear no connection" to the statements and are otherwise "too vague" to show that they were false or misleading. 1-ER-22.

*Second*, Plaintiffs again rely on the DMV Letters to argue Tesla was not even trying to reach Level 5 autonomy. As explained above (*supra*, at 21–22), this mischaracterizes a specific statement about Tesla's goal for City Streets prior to its release to the public. In any event, the DMV Letters were public during the Class Period. *Supra*, at 29–30.

*Third*, Plaintiffs make (Br. 36) the conclusory argument that "safety is inextricably linked with the functionality" of FSDC, such that "safety issues" necessarily establish the falsity of the Capability Statements. This argument fails for the precise reason the district court recognized—"the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the Capability Statements, and do not allege that the software was not capable of no intervention drives." 1-ER-24 (quotation marks omitted); *see also Veal v. Lendingclub Corp.*, 2020 WL 3128909, at *10 (N.D. Cal. June 12, 2020) ("[T]he

reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves."), *aff'd*, 2021 WL 4281301 (9th Cir. Sept. 21, 2021). And as explained (*see supra*, at 51-53), even crediting Plaintiffs' allegations concerning "safety issues," isolated incidents of accidents and software glitches are not sufficient to establish falsity.

*Fourth*, Plaintiffs argue (Br. 37) that their CW allegations support the falsity of the Capability Statements but identify only vague allegations that FSDC "struggled to consistently recognize road conditions" and that "had difficulties in making determinations at the more confusing areas of a highway." Not only do these allegations not set forth specific facts inconsistent with any of the Capability Statements, they are, at most, "facts cutting the other way." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176 (2015). Beyond that, Plaintiffs do not explain how those CWs had access to the information they purport to have, *Zucco*, 552 F.3d at 996 (CWs "were simply not positioned to know the information alleged"), or how the CWs' reports contradict any of the alleged Capability Statements, *see Espy*, 99 F.4th at 536 (CW statements merely amounted to "criticisms of J2's management practices and compensation structures").

*Finally*, once again Plaintiffs do not tie their expert's generalized analysis to the alleged falsity of any Capability Statement or allege that Tesla was not seeking

to solve the issues identified by the expert during the Class Period. *See supra*, at 49–50. These allegations are a far cry from those in *NVIDIA*, 81 F.4th at 941–43, to which Plaintiffs cite for the proposition that "allegations based on outside expert can support falsity" (Br. 38). To be clear, Defendants do not take issue with the idea of an outside expert, but rather with the generalized, conclusory nature of his findings and the lack of relationship of those findings to *any* specific alleged false statement in this case.

It is Plaintiffs' burden to meet the exacting standard for pleading falsity under the PSLRA, and Plaintiffs have not done so.

## III. THIS COURT MAY AFFIRM ON THE ALTERNATE GROUND THAT PLAINTIFFS FAILED TO ADEQUATELY PLEAD LOSS CAUSATION

Because the district court dismissed the Complaint due to Plaintiffs' failure to allege falsity and scienter, it did not reach Defendants' argument that the Complaint should be dismissed for failure to adequately plead loss causation. Because this Court may affirm the district court "on any ground the record supports," *Foster v. Wilson*, 504 F.3d 1046, 1050 (9th Cir. 2007), this Court also should affirm based on Plaintiffs' failure to plead loss causation.

To plead loss causation adequately, Plaintiffs must allege that "the revelation of th[e] misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff."

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013). In an efficient market, "a corrective disclosure must by definition reveal new information to the market that has not yet been incorporated into the stock price." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022) (alteration adopted) (quotation marks omitted).

Here, Plaintiffs assert the existence of five corrective disclosures but fail to connect those purported corrective disclosure to the revelation of new information necessary to assess the falsity of the alleged misstatement or an impact on the stock price.

As to the need for new information, Plaintiffs do not rely on, among other things, the purportedly "most damning" announcement that Tesla's representations concerning the release of Level 4-5 autonomy were false—Tesla's "admissions" to the California DMV. These *smoking-gun* "admissions" were public before any of the alleged corrective disclosures and—according to Plaintiffs' Complaint— disclosed exactly what was purportedly false or misleading about the alleged misstatements. Under such circumstances, Plaintiffs cannot plead loss causation. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) (no loss causation where alleged corrective disclosures occurred months after alleged fraud was revealed to the market); *Tchrs.' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) (similar).

Separately, Plaintiffs' loss causation theory fails for the independent reason that the purported corrective disclosures do not reveal falsity.

*First*, Plaintiffs rely on the National Highway Traffic Safety Administration ("NHTSA") investigation (4-ER-662–ER-665 ¶¶ 378–81), but the initiation of an investigation does not reveal the supposed "truth" about a supposed misstatement. That is because "an investigation, without more, is insufficient to establish loss causation," as it "does not 'reveal' fraudulent practices to the market." *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014).

*Second*, Plaintiffs rely on over-the-air "recall" announcements (4-ER-665–ER-666 ¶¶ 382–85; 4-ER-670–ER-673 ¶¶ 397–402), but a "recall" does not bear on the truth or falsity of specific statements. Not only does Plaintiffs' Complaint make clear that the "recall" announcements were nothing more than over-the-air software updates, but recalls are not corrective disclosures because they do not reveal the falsity of any prior alleged misstatement. *Metzler*, 540 F.3d at 1063. And because Tesla warned investors about the likelihood of recalls related to its software, such a disclosed risk cannot be a corrective disclosure. *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *10 (N.D. Cal. June 19, 2020) (failure to plead loss causation where loss stemmed from "known risks" rather than "hidden risk[s]").

59

*Third*, Plaintiffs rely on Musk's January 26, 2022 statement that "I would be shocked if we do not achieve full self-driving safer than human this year" (4-ER-666–ER-667 ¶¶ 386–89), but that cannot serve as a corrective disclosure because Defendants had never before stated that the FSDC technology was presently "safer than a human." *See supra*, at 51–52. To the extent Plaintiffs seek to link the statement to a drop in stock price, Plaintiffs fail to account for the other negative information that Tesla released during the same earnings call, including that Tesla would not introduce new vehicle models that year, and that Tesla continued to be constrained by supply chain issues. *E.g.*, 3-ER-472. A party does not sufficiently allege loss causation when the purported corrective disclosure itself provides a "more plausible" reason for the stock price reaction. *See Metzler*, 540 F.3d at 1063, 1065 (no loss causation where earnings miss was "more plausible" cause for stock drop).

*Finally*, the June 3, 2022 letter NHTSA sent to Tesla on May 4, 2022 relating to complaints from Tesla drivers (4-ER-667–ER-670 ¶¶ 390–96) is not a corrective disclosure because complaints alone do not reveal the falsity of any prior alleged misstatement. As this Court has held, a plaintiff cannot allege loss causation "merely by resting on a number of customer complaints and asserting that where there is smoke, there must be fire." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017).

Because Plaintiffs have failed to plead loss causation, the Court should affirm for this alternative reason.

## **<u>CONCLUSION</u>**

The Court should affirm the judgment of dismissal.

Dated: May 14, 2025                    Respectfully submitted,

*/s/ Ellyde R. Thompson*
Alex Spiro
Ellyde R. Thompson
Jesse Bernstein
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7100

*Counsel for Defendants-Appellees*

## REQUEST FOR ORAL ARGUMENT

Defendants-Appellees respectfully request that this Court hear oral argument in this appeal.

## STATEMENT OF RELATED CASES

Defendants-Appellees are not aware of any related cases pending in this Court.

## **FORM 8: CERTIFICATE OF COMPLIANCE FOR BRIEFS**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(b)(i) and Circuit

Rule 32-1, the brief's type size and typeface comply with FRAP 32(a)(5) and (6),

and the brief contains 13,984 words.


Dated: May 14, 2025              */s/ Ellyde R. Thompson*
                                 Ellyde R. Thompson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Answering Brief Of Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  May 14, 2025         */s/ Ellyde R. Thompson*
                                      Ellyde R. Thompson