**No. 25-55**

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆

OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION;
OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM, Lead Plaintiffs,

—and—

*Plaintiffs-Appellants,*

THOMAS LAMONTAGNE,

*Plaintiff,*

—against—

TESLA INC.; ELON MUSK,

*Defendants-Appellees,*

—and—

ZACHARY J. KIRKHORN, DEEPAK AHUJA,

*Defendants.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

CAROL C. VILLEGAS
JAKE BISSELL-LINSK
GUILLAUME BUELL
MATTHEW J. GRIER
LABATON KELLER SUCHAROW LLP
140 Broadway, 34th Floor
New York, New York 10005
(212) 907-0700

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................... 1

ARGUMENT ....................................................................................... 2

I.   THE COMPLAINT SUFFICIENTLY PLEADS
ACTIONABLE FALSE AND MISLEADING STATEMENTS ........ 2

    A.   Defendants' Safety Statements Were Materially False
and Misleading ........................................................................ 2

    B.   Defendants' Capability Statements Were Materially
False and Misleading .............................................................. 5

    C.   Defendants' Timeline Statements Were Materially
False and Misleading ............................................................ 10

II.   THE PSLRA'S SAFE HARBOR IS INAPPLICABLE ................... 14

    A.   The Statements Are Not Forward-Looking .......................... 14

    B.   Even If Forward-Looking, The Safe Harbor Does Not
Apply ...................................................................................... 16

    C.   A Statutory Exclusion from Safe Harbor Protection
Applies Here ......................................................................... 19

III.   THE COMPLAINT SUFFICIENTLY PLEADS SCIENTER ........ 22

    A.   Defendants' Own Words Support Scienter ........................... 22

    B.   Defendants' Access to Information Scienter .......................... 25

    C.   Confidential Witness Allegations Support Scienter ............. 26

    D.   Core Operations Supports Scienter ...................................... 29

    E.   Defendants' Risk Disclosures Do Not Negate Scienter ........ 30

i

     F.     Musk's Stock Sales and History of Fraud Support
             Scienter...............................................................................31

IV.    THE COMPLAINT SUFFICIENTLY PLEADS LOSS
       CAUSATION ...................................................................33

CONCLUSION ....................................................................37

STATEMENT OF RELATED CASES ...................................40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ..................................... 34

*In re Atossa Genetics Inc Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ............................................................. 17

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................... 4, 9

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ............................................................. 35

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ..................................................... 20-21

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) ........................................................... 36

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......................................................................... 33

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ..................................................... 23, 27-28

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ............................................................. 18

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ................................................... 13, 27, 28

*Jedrzejczyk v. Skillz, Inc.*,
2024 WL 1635568 (9th Cir. Apr. 16, 2024) ......................................... 5

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................... 3

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002)......................................................24, 25

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ........................................28, 29, 36

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008)......................................................23-24

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018)......................................................33-34

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020)..............................................15

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v.*
    *Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003).............................................................32

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004)......................................................22, 23

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019)......................................................28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*
    *Pension Fund*,
    575 U.S. 175 (2015)....................................................................10, 11

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) .............................................................34

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996)......................................................18, 35

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)....................................................2, 14, 29

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016)..............................................36

*Roberts v. Zuora, Inc.*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ..................................... 28

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ............................................................. 23

*Saraf v. Ebix, Inc.*,
632 F. Supp. 3d 389 (S.D.N.Y. 2022) ................................................ 33

*SEC v. Dain Rauscher, Inc.*,
254 F.3d 852 (9th Cir. 2001) ............................................................. 20

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ............................................................. 32

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) .................................... 19

*Tchrs.' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ............................................................. 34

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ................................................................. 2, 7, 33

*In re Thoratec Corp. Sec. Litig.*,
2006 WL 1305226 (N.D. Cal. May 11, 2006) ........................................ 7

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ........................................................... 16

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .................................................. 8, 24, 25

**Statutes**

15 U.S.C. §78u–5(b) ............................................................................ 19

**Other Authorities**

S. REP. NO. 107-146 (2002) ........................................................... 21, 22

## INTRODUCTION

Defendant Elon Musk repeatedly represented that Tesla was on the cusp of releasing safe and functional Level 4-5 autonomous driving technology ("ADT"). But as Plaintiff's principal brief[1] explains, these representations were false. In fact, Tesla ***admitted*** to regulators that Musk's pronouncements were "exaggerations" and that Tesla's cars were nowhere true self-driving. Many other facts confirm falsity and scienter.

Defendants ignore many of the misstatements and pay little attention to Plaintiff's robust allegations. They, instead, attempt to spin a counter-factual narrative in which Musk didn't say what he said and confusingly suggest that all the misstatements are forward-looking, disregarding categories of present-tense statements. Defendants also suggest that Musk—who boasted about his "deep understanding" and involvement in developing Tesla's ADT—was ignorant of its basic limitations and duped by his engineers into believing it was better than it was. This is implausible and is belied by common sense.

---

[1] The Brief for Lead Plaintiff-Appellant is cited as "PB-___;" the Brief for Defendants-Appellees is cited herein as "DB-___." Terms are defined as stated in the Brief for Lead Plaintiff-Appellant; all emphasis is added and all internal citations and quotation marks are omitted.

## ARGUMENT

### I. THE COMPLAINT SUFFICIENTLY PLEADS ACTIONABLE FALSE AND MISLEADING STATEMENTS

#### A. Defendants' Safety Statements Were Materially False and Misleading

The Safety Statements (ER-644-45_¶319, ER-654_¶349, ER-656_¶353, ER-658_¶359, ER-659_¶365, ER-660_¶367) were materially misleading because Tesla's ADT could not "self-drive" more safely than humans. PB-28-32.[2]

Courts ruling on a motion to dismiss must "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "construe them in the light most favorable to" plaintiffs. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). Defendants improperly reinterpret the Safety Statements, suggesting they merely meant Tesla's ADT was safer than a human **when** a human was also present. DB-51.

---

[2] Defendants argue that those Safety Statements that concerned autopilot, rather than FSD, are inactionable because Plaintiff conflates these distinct products. DB-51. But ***Defendants*** routinely conflated these terms, using a convoluted mix of terminology to refer to its ADT to promote the technology as more capable than it was. ER-572-75_¶¶60-64. And in any event, the AC alleges that the Safety Statements concerning both autopilot and FSD were false and misleading because Tesla's ADT could not drive more safely than humans. PB-28-32.

This reinterpretation is belied by the plain language of the statements. For instance, when Musk said "autopilot is about twice as safe as a normal driver," he was representing that the technology could drive safer than a human, ***with no caveat***. ER-644-45_¶319. The same goes for Musk's statement that "the safety that we're seeing when the car is in FSD mode is actually significantly greater than the safety we're seeing when it is not." ER-660_¶367. This statement plainly represented that a car in FSD mode drives safer than a car not in FSD mode—and there is no indication that "FSD mode" only referred to situations where a human was supervising. Indeed, investors cared about the capabilities of FSD because Defendants touted the importance of self-driving technology to Tesla's business, including that it would allow Tesla to launch a lucrative "robotaxi" business, which depended on ***unmanned*** vehicles. ER-572_¶¶55-58; ER-578-79_¶¶75-81. This Court should not endorse Defendants' effort to "present their own version of the facts." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).[3]

---

[3] While Defendants say that Tesla "repeatedly cautioned that both Autopilot and [FSD] require drivers to remain engaged" (DB-52), Defendants ignore allegations explaining why the public would not have credited these statements—they read as legalese and were contradicted by Defendants' misstatements and Musk's conduct. ER-575-78_¶¶65-74.

3

As for the high rate of self-reported driver interventions (ER-615-16_¶212)—data that must be credited at the pleading stage—Defendants argue that just because the technology "may occasionally require driver intervention" does not mean it was less safe than a human driver. DB-52-53. But the data shows driver intervention was required every 16 miles, which is ***thousands of times*** worse than Tesla's primary competitors[4] (ER-615-16_¶212) and incomparably more often than the most dangerous human drivers—obviously human drivers do not need another "backseat driver" human to intervene to avoid crashes every 16 miles. PB-30-31. Thus, when Musk represented that Tesla's ADT was safer than humans, he created an "impression of a state of affairs that differ[ed] in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Defendants whitewash allegations detailing the data establishing significant safety issues with ADT. ER-611-15_¶¶204-10. Specifically, they argue news articles and anecdotes highlight "isolated incidents."

---

[4] That "Plaintiff[] do[es] not allege as false any statements comparing Tesla to its competitors" (DB-52) is irrelevant; the purpose of this comparison is to establish—along with several other facts (PB-28-32)—that Tesla's ADT was not safer than human.

DB-53. But the AC details research demonstrating **thousands** of deficiencies in Tesla's ADT, where it **programmatically** fails to safely complete basic driving tasks like not stopping at stop signs. ER-614-15_¶¶209-10. Indeed, news articles establish that Tesla's autopilot and FSD systems "have been involved in far more incidents than driver-assistance systems from all other manufacturers combined" and "more severe—and fatal—crashes than people in a normal data set." ER-611-13_¶¶204-05. Defendants also ignore that Tesla's own records document **thousands** of complaints (ER-617_¶217)—addressing problems that **_Tesla_** deemed a "[d]irect risk to customer safety." ER-617-18_¶219.[5]

## B. Defendants' Capability Statements Were Materially False and Misleading

The Capability Statements (ER-646_¶323, ER-652_¶343, ER-653_¶345, ER-655_¶351, ER-656_¶355, ER-658_¶361) were misleading because Tesla had not achieved Level 4-5 autonomy. PB-33-38.

Defendants again argue that Musk didn't say what he said (DB-54-55), spinning a counter-factual narrative that cannot be credited. Oddly,

---

[5]These are not "vague" allegations that accidents were frequent (DB-53) or that Tesla was "working out [software] bug defects," *Jedrzejczyk v. Skillz, Inc.*, 2024 WL 1635568, at *1 (9th Cir. Apr. 16, 2024), and so Defendants' caselaw is distinguishable.

Defendants point to Musk's tweet—"[t]he latest build is capable of zero intervention drives" (ER-653_¶345)—as an example of a statement that Defendants believe did not represent that Tesla achieved Level 4-5 autonomy. DB-54. But this is what Level 4-5 autonomy means—*i.e.*, the technology does not require a human to intervene. ER-573-74_¶¶61-62. Musk also claimed that ADT could complete cross country trips (ER-646_¶¶323-24) and stated it was "very common" for him to have no intervention drives. ER-656_¶355. While Defendants propose an alternative interpretation—namely that just because the technology was "***capable***" of zero intervention doesn't mean investors interpreted Musk as saying it "***always***" achieved zero intervention drives (DB-54-55)—this is not what Plaintiff alleges, and is an inappropriate fact-based argument.

Defendants also do not adequately address Tesla's ***admission*** to regulators that it had not achieved Level 4-5 autonomy.ER-619-20_¶228, ER-621_¶232. Rather, Defendants muster another factual dispute, claiming these admissions referred only to Tesla's City Streets feature, not ADT. But, the AC alleges the correspondence with the CA-DMV concerned Tesla's release of its "FSD" software, not just the City Streets

6

feature (*see* ER-619-20_¶¶227-30); that "City Streets" was just the name Tesla gave to the operation of its ADT on non-highway roads (ER-619_¶227 n.6, ER-619-620_¶228); and also that Tesla's whole ADT ran on the same machine learning-based model. *See* ER-594_¶139, ER-635-37_¶¶288-91. Most critically, if the ADT was not Level 4-5 on city streets, it was clearly not Level 4-5 in the sense conveyed by Musk. These allegations, which demonstrate that Tesla's admission concerned its ADT as a whole, must be accepted as true. *Tellabs*, 551 U.S. at 322.[6]

Tesla's admissions to the CA-DMV alone establish that the Capability Statements were misleading—but the AC includes other allegations unrebutted by Defendants establishing falsity. PB-33-38.

First, Tesla's ADT could not drive safely and thus could not be a Level 4-5 system. Defendants suggest that safety issue allegations do not support the falsity of the Capability Statements. DB-55-56. However, safety is inextricably linked with the ADT's functionality, because for a car to truly "self-drive," it must do so safely without **any** human

---

[6] Defendants argue the CA-DMV materials were publicly available—a truth-on-the-market argument that is "not [available] at the pleading stage." *In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006).

intervention. ER-573-74_¶61. As such, these safety issues further establish falsity. Defendants offer no response, other than parroting the district court's finding that the safety issues bear no connection to the substance of the Capability Statements. DB-55.

Second, CW allegations further support the falsity of the Capability Statements. Defendants claim these allegations are vague—but the AC describes the CWs with "sufficient particularity to establish their reliability and personal knowledge," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), detailing each CW's job title, responsibilities, and dates of employment. ER-622_¶236, ER-624_¶243, ER-625_¶248. CW1, for instance, was a FSD Analyst and Quality Assurance analyst (ER-622_¶236)—meaning she was positioned to have personal knowledge of Tesla's FSD[7]—and she explains that Tesla's vision-based ADT, which depends on being able to accurately identify road features and react accordingly, was deeply unreliable and not

---

[7] Without explanation, Defendants state that Plaintiff does "not explain how those CWs had access to the information they purport to have." DB-56. But the AC plainly details why each CW had personal knowledge, which is the relevant standard. *Zucco*, 552 F.3d at 996. Indeed, CW1 was responsible for feeding and labeling accident and safety data into the neural network (ER-622_¶¶237-38), which explains why she knew about the reliability of the system.

capable of supporting Level 4-5 automation. ER-622_¶242. Defendants also ignore CW2, who explained that it was well known in Tesla's Autopilot department that Tesla's ADT had difficulties in making determinations at the more confusing areas of a highway (ER-624-25_¶¶243-47)—something she was positioned to know because she worked in the Autopilot department. ER-624_¶243. These are "specific facts" establishing that the Capability Statements created an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson*, 527 F.3d at 985.

Finally, Defendants challenge Professor Pimentel, who details functionality and dependability problems that Tesla faced (ER-628-40_¶¶260-302), arguing his findings are "conclusory." DB-56-57. But Pimentel details the bases for his findings, such as his analysis of Tesla-specific materials and reports to highlight functionality challenges in Tesla's ADT (ER-629-34_¶¶267-84), and explains specific design decisions Tesla made that undermined its ability to achieve Level 4-5 autonomy. ER-635-37_¶¶285-92.

### C. Defendants' Timeline Statements Were Materially False and Misleading

The Timeline Statements (ER-642-43_¶313, ER-643_¶315, ER-644_¶317, ER-646_¶323, ER-651_¶339, ER-652_¶343, ER-654_¶349, ER-655_¶351) were misleading because Tesla was nowhere near Level 4-5 autonomy. PB-38-43. Defendants' counterarguments fail.

First, Defendants claim the Timeline Statements are opinions because they are "not subject to objective verification" and because there are no allegations "establishing that Defendants' opinions . . . were not subjectively held." DB-46-47. But many of Musk's statements—even those couched in prefatory language—express certainty. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015); *e.g.*, ER-642-43_¶313 ("I think we will be feature complete full self driving this year. . . . ***I'm certain of that. That is not a question mark***."); ER-643_¶315 ("So there's feature complete for full self-driving this year with ***certainty*. . . . *I'm certain of this***."). Further, even if they are "opinions," the Timeline Statements are actionable. As described in Section III, the AC alleges Musk "did not hold the belief[s] [he] expressed"—rendering any opinions actionable. *Omnicare*, 575 U.S. at 185-86. Such subjective falsity, however, is not even required, as a "pure

10

statement[] of opinion" is actionable if it "omits material facts" that "conflict with what a reasonable investor would take from the statement itself." *Id.* at 186, 189. Here, Defendants' statements omitted conflicting material facts. PB-38-43.

Second, Defendants try to soft-pedal Tesla's admissions. PB-39-40. Defendants claim the alleged falsity of the Timeline Statements "boil[s] down to a complaint that Tesla took too long," when investors "were on notice that Tesla's full release of FSD was taking longer than initially planned." DB-47-48. But Tesla *was nowhere near* Level 4-5 autonomy at that time. This was a public assurance of a timeline that Tesla acknowledged internally (and simultaneously) to be unachievable. Indeed, in November and December 2020, Tesla informed the CA-DMV that Tesla's FSD software was not "autonomous," but ordinary "Level 2" driver assistance software (like cruise control), and that Tesla *was not expecting any "significant enhancements"* to the software that would render it Level 3-5. ER-619-21_¶¶227-31. Tesla therefore *admitted* to CA-DMV in November and December 2020 that there no expectations of Level 4-5—and yet, *at this same time*, Musk told investors (in December 2020) that Tesla would achieve "full autonomy"

11

and "release[e] it to the Tesla customer base next year." ER-654_¶349. This was misleading. Tesla also admitted in March 2021 that Musk's messaging about Level 4-5 autonomy by the end of 2021 "***does not match engineering reality***" (ER-621_¶232)—an acknowledgment that the Timeline Statements were false.[8]

Third, the detailed analysis of Plaintiff's expert supports the conclusion that Tesla was far from achieving Level 4-5 autonomy. ER-628-40_¶¶260-302; PB-42. Defendants characterize his analysis as "broad, non-specific criticisms" (DB-49)—but the analysis is far more detailed, including identifying nine specific functionality deficiencies Tesla needed to complete before it could release Level 4-5 autonomous vehicles. ER-629-34_¶¶267-84. This analysis supports a finding that the Timeline Statements were false—and it is corroborated by Tesla's own

---

[8] Defendants point to Musk's December 2020 statement about "an uncertain period of time" for how long regulatory approval will take. DB-48. But this doesn't cure the falsity of his statements. Again, ***at this very same time***, Tesla admitted that there was no expectation of Level 4-5 autonomy any time soon. ER-619-21_¶¶227-31. It was therefore misleading for Musk to tell investors that he was "extremely confident" of full autonomy by the end of 2021. ER-654_¶349. Further, Plaintiff ***does*** allege contemporaneous facts that render Musk's statements false. PB-42-43.

admission in March 2021 that achieving full autonomy by the end of 2021 did "**not match engineering reality**." ER-621_¶232

Fourth, Defendants again characterize the CW allegations as "vague" "conjecture." DB-50. But the CW allegations are reliable and concrete (*see supra* at Section III(C)), including the statements of CW2, who explained it was well-known in the Autopilot department that Musk's pronouncements were "exaggerations," and it was discussed openly on department-wide conference calls that the vehicles were nowhere near full self-driving and that, for example, Tesla's ADT had difficulties in making determinations at the more confusing areas of a highway. ER-624-25_¶¶243-47. These allegations support the falsity of the Timeline Statements. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) (crediting CW allegations supporting falsity).

Finally, Defendants argue Musk's statement that he was "very confident about Full Self-Driving functionality being complete by the end of this year" (ER-652_¶343)—is puffery. But Defendants pluck this statement out of context: Musk—on an earnings call—was describing that the autonomous technology was getting so advanced that he was

13

able to drive to work "with no interventions, despite going through construction and widely varying situations," and that "***this is why***" he was "very confident about Full Self-Driving functionality being complete by the end of this year." ER-652_¶343. Musk was not speaking in "subjective or emotive terms," but instead "provid[ing] a concrete description" of the state of Tesla's ADT, which was misleading because it "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Quality Sys.*, 865 F.3d at 1143-44 (statements that a company's pipeline is "very consistent," "deep," and "keeps growing," and that "[t]here is nothing drying up" were not puffery).

## II.   THE PSLRA'S SAFE HARBOR IS INAPPLICABLE

The district court erred in determining certain alleged misstatements (ER-642-43_¶313, ER-643_¶315, ER-644_¶317, ER-651_¶339, ER-654_¶349, ER-655_¶351, ER-656_¶353) are protected by the PSLRA's safe harbor. ER-14-15.

### A.   The Statements Are Not Forward-Looking

The safe harbor does not apply because the challenged statements omitted present facts and because several were framed as guarantees or certainties, rather than projections. PB-43-46.

14

Defendants argue these statements "do not reflect any assertions of current or past fact" and were purely forward-looking projections of a future goal. DB-35-38. Defendants ignore that these statements "omit[ted] or misrepresent[ed] the present facts underpinning those statements." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1021 n.15 (N.D. Cal. 2020). Take, for instance, Musk's December 2020 statement that he was "extremely confident of achieving full autonomy and releasing it to the Tesla customer base next year." ER-654_¶349. This omitted a key present fact: Tesla's FSD software was Level 2 and Tesla ***was not expecting any "significant enhancements"*** to the software that would render it a Level 3-5 ADT. ER-619-21_¶¶227-31.

Defendants also ignore that several of the statements were framed as guarantees or certainties, transforming what otherwise might be forward-looking statements into statements about the present. PB-44-46; *e.g.*, ER-642-43_¶313 ("I'm certain of that. That is not a question mark."); ER-643_¶315 ("with certainty;" "I'm certain of this"); ER-644_¶317 ("next year, for sure"); ER-655_¶351 ("100%"). Defendants' only retort is that "[e]ven when projections are made with optimism and confidence, that does not put them outside the reach of the Safe Harbor." DB-37-38. But

Musk wasn't merely expressing "optimism" or "confidence"—he was projecting *certainty*, which describes a *current* circumstance (*i.e.*, "*I'm* certain"). Defendants offer no response.[9]

## B. Even If Forward-Looking, The Safe Harbor Does Not Apply

Defendants' statements—even if deemed forward-looking—are not entitled to safe harbor protection. PB-46-50.

**No Meaningful Cautionary Language**. Plaintiff challenges the district court's determination of safe harbor protection for certain statements—(ER-642-43_¶313, ER-643_¶315, ER-644_¶317, ER-651_¶339, ER-654_¶349, ER-655_¶351, ER-656_¶353)—none of which were made on earnings calls or in SEC filings, nor "identified as forward-looking or accompanied by forward-looking language," as even the district court acknowledged. ER-17. Because these statements were not accompanied by *any* cautionary language, these statements cannot receive safe harbor protection.

---

[9] Defendants cite *Wochos v. Tesla, Inc.* but fail to respond to Plaintiff's explanation that, here, Musk was not articulating a "predicate assumption[]" on which his future projection was based, like the "on track" statements at issue in *Wochos*. 985 F.3d 1180, 1192 (9th Cir. 2021); PB-45-46.

Defendants argue these statements are nevertheless protected by the bespeaks caution doctrine. But "[d]ismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017).[10]

Defendants do not meet this standard. Instead, they claim boilerplate cautionary language included at the start of earnings calls and the risk disclosures in SEC filings were sufficient to cover ***every*** forward-looking statement made during the Class Period, regardless of the context or whether the statement was accompanied by its own cautionary language. DB-44-45. But this would render the cautionary language requirement meaningless: a defendant could simply include boilerplate cautionary language in an SEC filing and receive automatic protection for ***all*** forward-looking statements.

---

[10] Defendants argue Plaintiff waived this argument. DB-45. This is false: In the motion to dismiss briefing (*see* ER-99), Plaintiff ***did*** address Defendants' argument that the bespeaks caution doctrine applied, citing *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005). *Id.*

More fundamentally, Defendants have not demonstrated (as is required) that, as a matter of law, their "forward-looking representations contained **enough** cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Fecht v. Price Co.*, 70 F.3d 1078, 1081-82 (9th Cir. 1995) ("[i]nclusion of **some** cautionary language is not enough").

Even if the cautionary language included in Tesla's earnings calls and SEC filings are deemed to have adequately "accompanied" the challenged statements, the cautionary language was not meaningful. The boilerplate language preceding each earnings call did not address any of the issues underlying Plaintiff's claims, nor was it tailored to Defendants' statements. PB-47-48. Defendants hardly offer a response to this, other than to say that this language is "precisely what the PSLRA requires." DB-42. But this Court made clear that to be meaningful, cautionary language must "precise[ly]" and "directly address" the alleged misrepresentations, and "[b]lanket warnings" do not suffice. *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996). Tesla's risk disclosures are no better. PB-48-49. Warning that there "is no guarantee" (DB-42) that Tesla would be able to introduce the self-driving technology was not

sufficient because there was no chance of Tesla releasing Level 4-5 ADT at any time during the Class Period. Defendants argue that the SAC includes no allegation supporting this (DB-43), but numerous allegations show Tesla was nowhere near completing that technology—as Tesla itself privately told regulators.[11] *See supra* at 6-7.

**Actual Knowledge**. The safe harbor also does not apply because Defendants had actual knowledge of the information establishing falsity. *See infra* at Section III.

### C. A Statutory Exclusion from Safe Harbor Protection Applies Here

The safe harbor is also inapplicable because a statutory exclusion applies. PB-50-53. Indeed, the safe harbor does not apply to statements concerning an issuer that has (within three years) been the subject of an order barring violations of anti-fraud provisions of the securities laws. 15 U.S.C. §78u–5(b). Here, Tesla was barred from violating Rule

---

[11] As Defendants' own authority recognizes (DB-44-45), "[c]ourts have exercised caution in applying the bespeaks caution doctrine at the pleading stage when plaintiffs have alleged that defendants possessed material information, at the time that they provided cautionary statements, that rendered even the cautionary statements themselves fraudulent or at least misleading." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *11 (N.D. Cal. Sept. 29, 2000).

13a-15—an anti-fraud provision of the securities laws—in a settlement of an SEC action alleging Musk defrauded investors in his offer to privatize Tesla, contemporaneous with an order barring Musk from violating Rule 10b-5. ER-688-89_¶¶457-59.

Defendants argue—as the district court mistakenly found—that Rule 13a-15 does "not address intentional wrongdoing and ***thus*** [is] not [an] antifraud provision[]." DB-39. But not all "antifraud provisions" require intentional "wrongdoing." PB-51-52; *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001) (Sections 17(a)(2) and (3) of the Securities Act, which are "antifraud provisions," do not require scienter or intentional wrongdoing). As such, it is not dispositive (as Defendants claim) that Rule 13a-15 includes no "reference to the speaker's state of mind." DB-38-39. Defendants do not offer much of a response, other than acknowledging the Securities Act is "plainly an antifraud statute" (DB-40), even though certain provisions of the Securities Act (*i.e.*, Sections 17(a)(2) and (3)) do not require intentional wrongdoing.[12] And that's

---

[12] Defendants cite a case interpreting §13(d), from years before Rule 13a-15 was enacted, which by mere coincidence used the term "antifraud provision" in noting that an unrelated cause of action within §13(d) lacked a scienter element. DB-39 (citing *SEC v. McNulty*, 1996 WL 422259, at *7 (S.D.N.Y. July 29, 1996)). Further, *Carvelli v. Ocwen*

Footnote continued on next page

precisely the point: when assessing whether a provision of the securities laws is an anti-fraud provision, it's not sufficient to focus solely on whether intentional wrongdoing is required—a provision could be "anti-fraud" even without intentional wrongdoing. Instead, it is critical to examine the legislative history and context in which the provision was promulgated, which for Rule 13a-15 demonstrates that it is an anti-fraud provision.[13] PB-50-53. Indeed, Rule 13a-15 was promulgated in implementing the Sarbanes-Oxley Act ("SOX"), which was passed to "***prevent*** and punish corporate and criminal fraud" and "ensur[e] that the corporate fraud and greed may be better detected, ***prevented*** and prosecuted." S. REP. NO. 107-146, at 2 (2002); PB-50-51. SOX was Congress's response to one of the largest frauds in modern history—the Enron "debacle"—which "seriously eroded" trust in our financial system, and the goal of the legislation was to prophylactically prevent such

---

*Financial Corp.*, 934 F.3d 1307 (11th Cir. 2019) (cited at DB-39) does not address Rule 13a-15, and it also incorrectly determined that antifraud provisions require scienter. *Id.* at 1325.

[13] Defendants argue the legislative history and context in which it was promulgated do not establish that Rule 13a-15 is an anti-fraud provision. But again, Defendants focus on whether the SEC discussed "any state of mind requirements" when promulgating the rule, citing the district court (DB-39-40), which, as explained, is not determinative.

frauds. S. REP. NO. 107-146, at 2 (2002). It is therefore an "anti-fraud" statute—and there is no reason to conclude that "anti-fraud" laws deal simply with **punishing** fraud (as Defendants contend); they also concern **preventing** fraud, which is what Rule 13a-15 does.

## III. THE COMPLAINT SUFFICIENTLY PLEADS SCIENTER

### A. Defendants' Own Words Support Scienter

Defendants' own statements and admissions support scienter. PB-54-58. For instance, Musk touted his in-depth understanding of Tesla's ADT and detailed involvement in developing the technology, while making precise misstatements about these topics. PB-54-57.

Defendants claim these allegations simply amount to general assertions of Musk's "awareness of the day-to-day workings of the [] business." DB-18. But this is belied by Musk's admissions, which professed his "deep understanding" of the status of the technology (ER-674-75_¶405), his "deep[] involve[ment]" developing the technology (*id.*), and that he personally "manage[d] autopilot engineering directly every week *in detail*." ER-643_¶315.

Musk **himself** acknowledged his detailed involvement and understanding of Tesla's ADT. *See, e.g.*, *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (CEO's

22

statement, "I love getting involved in every detail of the business" supported scienter).

Defendants fail to meaningfully distinguish Plaintiff's caselaw. DB-18-19. Defendants ignore that in *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023) this Court found scienter where defendant "himself publicly stated that he carefully monitored" the facts at issue (*id.* at 939-40), which is precisely what the AC alleges. Likewise, in *Oracle*, this Court rejected the district court's determination that the complaint included "mere allegations of a 'hands-on' management style," because, as here, plaintiff "allege[d] specific admissions from the three top executive officers" that they dove deep into the company's business. 380 F.3d at 1234; *compare id.* ("I love getting involved in every detail of the business"), *with* ER-674-75_¶405 ("I'm deeply involved with the [Autopilot] team. So we talk every week.").[14] Defendants fail to explain why this same reasoning does not apply here.[15]

---

[14] *See also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (explaining that "**specific admissions from top executives** that they are involved in every detail of the company" contribute to an inference of scienter).

[15] Defendants' caselaw is also readily distinguishable. Musk's own admissions amount to more than mere allegations of "general awareness

Footnote continued on next page

Further, Defendants' admissions to regulators that Tesla did not have ADT safer than humans or that was capable of Level 4-5 autonomy further supports scienter. PB-57-58. Defendants' contention that these admissions only concerned Tesla's City Streets feature is mistaken and inconsistent with the AC's allegations. Defendants also suggest that the CA-DMV admission establishes Musk's "transparency" with investors because the CA-DMV materials disclosed that "Musk's predictions were based on 'extrapolating on the rates of improvement,'" which was consistent with Musk's statements to investors. DB-22. But there was nothing transparent about Musk's assurance of Level 4-5 autonomy, which Tesla admitted "does not match engineering reality" (ER-621_¶232)—something Musk had to have known, considering he admitted he "manage[d] autopilot engineering directly every week in detail." ER-643_¶315.

---

of the day-to-day workings of the company's business." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008). And neither *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002), nor *Zucco*, 552 F.3d at 1000, concerned allegations that the defendants admitted to closely monitoring the facts at issue.

## B. Defendants' Access to Information Scienter

The AC demonstrates that Defendants "had actual access" to conflicting information about Tesla's ADT. PB-58-59.

Defendants argue the AC does not identify the type of information Musk had access to. DB-19-20. That is false. Musk *himself* described the data Tesla collected, explaining that "[s]ince all Tesla cars are connected, we analyze each accident" (ER-676-77_¶410) and that, as of April 2020, Tesla "collect[ed] data from over 1 million intersections every month" (ER-676_¶409) and would "[s]oon . . . be collecting data from over 1 billion intersections per month." *Id*. Tesla also kept detailed documentation of thousands of safety issues organized into tables and presentations, and tracked safety issues using a program called Jira, as confirmed by CW3. ER-616-18_¶¶215-19, ER-626_¶254, ER-677_¶411.[16]

---

[16] Defendants caselaw is distinguishable. In *Lipton*, 284 F.3d at 1036, the plaintiffs merely "refer[ed] to the existence" of certain data and "ma[de] a general assertion about what they think the data shows,", whereas here, the AC sets forth that Tesla meticulously tracked safety problems. And in *Zucco*, 552 F.3d at 1000, metrics management had access to were *already* manipulated, whereas here, Musk had access to, and was updated about, the technology.

25

### C.  Confidential Witness Allegations Support Scienter

CW allegations confirm the problems with Tesla's ADT were known within the Company and that Musk was regularly updated on the status of the technology. PB-59-65.

As an initial matter, Defendants mischaracterize Plaintiff's position, stating that "even Plaintiff[] contend that the CW allegations **only show** that 'Musk was regularly updated on the status of the technology.'" DB-24. But the CW allegations demonstrate much more: it was "absolutely" known within Tesla's Autopilot department that Musk's statements were "exaggerations" (ER-624_¶¶243-45, ER-677-78_¶415) and that Tesla's vehicles were nowhere near full self-driving, which was discussed openly on department-wide conference calls. ER-677-78_¶415. CW allegations also show Musk was heavily involved with the Autopilot department, regularly attending meetings and receiving reports (ER-625-27_¶¶248-56, ER-678-78_¶419), while also interacting directly with the engineers as they worked (ER-678-79_¶419)—as **Musk himself acknowledged**. ER-674-75_¶405 ("I'm deeply involved with the [Autopilot] team. So we talk every week.").

Defendants also mischaracterize the CW allegations, stating Plaintiff does "not allege what information was reflected in the reports or when, or who attended the relevant meetings, when they occurred, or what was said." DB-27. But the AC *does* include these facts. For instance, CW3 describes that Musk had regular meetings with the leaders of the Autopilot software program, as well as engineers, and that Musk would communicate directly with Tesla's Director of Engineering about engineering issues (ER-625_¶250); CW3 also explained that Musk received reports and updates during regular meetings, including meetings with the Engineering team's leaders that occurred on Mondays, and that during these meetings Musk would discuss "regressions" with the code and any other issues with Autopilot (ER-625-26_¶251); CW3 also details the names of the people Musk met with regularly (ER-626_¶255).

Defendants also mischaracterize applicable law. For instance, they suggest CW1 is unreliable because she "worked at Tesla for only six months of the Class Period." DB-25. But a complaint "need only provide a basis for each CW's knowledge about the specific statements *he made*," *Glazer*, 63 F.4th at 771, which means CW1 can credibly speak about information learned during her time of employment. *See NVIDIA*, 81

F.4th at 939 (CW who quit at start of class period provided "relevant and probative" information); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (CW need not work at company "for the entire class period").

The same is true of Defendants' argument challenging CW2's description of what was known within the Autopilot department about the capability limits of Tesla's ADT. DB-26. Defendants characterize these statements as unreliable hearsay (*id.*), but CW2 articulated his direct knowledge of what was widely known within the department in which he worked—which is precisely the type of allegation this Court credits. *See Glazer*, 63 F.4th at 771. And in any event, "the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019) (same).[17]

---

[17] Defendants argue that *LifeLock* is distinguishable because the CW who reported hearsay identified the source by name. DB-26. But this Court in *LifeLock*, 780 F. App'x at 484-85 n.5, did not itself identify this as a meaningful fact, instead crediting the hearsay because the CW's statements "form[ed] a plausible and coherent narrative" and because the CW was positioned to have personal knowledge of what he heard, , which is precisely the case here. PB-61-62. And further, the Court in *LifeLock*

Footnote continued on next page

28

Defendants are also mistaken that CWs must have "direct access" to a defendant. DB-26; *see Quality Sys.,* 865 F.3d at 1139, 1145 (scienter supported by CW statements of "five lower-level [ ] employees").[18]

### D. Core Operations Supports Scienter

The core operations doctrine supports an inference of scienter. PB-65-66. As a threshold matter, Defendants acknowledge that "specific admissions" of detailed involvement by a corporate executive is sufficient to demonstrate the applicability of the core operations doctrine. DB-24 (citing cases). Defendants' argument that the AC fails to allege "that Musk was involved in [such] minutiae" (DB-23) of Tesla's ADT is preposterous. Here, Musk repeatedly touted his involvement in the minutiae of Tesla's ADT (*see* Section III(A)), which Tesla carefully tracked (*e.g.*, ER-616-18_¶¶215-19, ER-625-27_¶¶248-56).

---

cited *Lloyd*, in which the source of the hearsay was "***not*** identif[ied] by name." 811 F.3d at 1208.

[18] Defendants argue the most plausible inference from certain CW allegations is that Tesla engineers manipulated Musk into being optimistic about Tesla's ADT because they trained their models to focus on routes Musk drove. DB-20. But it is implausible (and certainly not the most plausible inference) that Elon Musk—the world's most notorious polymath, who himself touted his "deep understanding" of the technology and who "manage[d] autopilot engineering directly every week ***in detail***" (ER-674-75_¶¶405-06)—was tricked by his own engineers into believing the technology was far better than it was.

Defendants confusingly argue that the core operations doctrine does not apply because "Musk's statements concerned predictions and estimates for highly complex state-of-the art technology that was evolving and being developed on a daily basis." DB-23. But they do not explain why this is relevant to whether the core operations doctrine applies, and they oddly overlook that the alleged misstatements are not limited to "predictions and estimates" (*id.*) but include statements about the present-tense safety and capabilities of the technology. *See supra* at Sections I(A)-(B).

Defendants simply make the conclusory assertion that Plaintiff "fails to plead the facts necessary for a core operations theory" (DB-22), without addressing Defendants' many statements unambiguously touting the development of self-driving cars as the most important aspect of Tesla's business (ER-570-72_¶¶45-59, ER-673_¶404) and "the difference between [the defendant-company] being worth a lot of money and ***worth basically zero***." ER-572_¶56.

### E. Defendants' Risk Disclosures Do Not Negate Scienter

Defendants wrongly argue that Tesla's risk disclosures negate scienter. DB-16-17.

30

As an initial matter, Defendants again ignore that the alleged misstatements do not simply concern the timeline for releasing self-driving technology but also concern the safety and capability of it. *See supra* at Sections I(A)-(B). Defendants do not explain how these risk warnings have any relevance to the scienter analysis of the Safety and Capability Statements.

To the extent Defendants argue the risk disclosures negate scienter as to the Timeline Statements, this argument also fails. As detailed herein, the cautionary language included in these risk disclosures was not meaningful and thus cannot shield Defendants from liability. *See supra* Section II(B); PB-48-49.[19]

### F. Musk's Stock Sales and History of Fraud Support Scienter

Musk sold over 141 million Tesla shares, collecting proceeds of over $39 billion, ***reaping more than $35 billion in profit***. ER-567_¶33, ER-680_¶¶425-26. Musk's sales were also dramatically inconsistent with his prior trading (ER-681_¶¶430-31) and suspiciously timed: the average

---

[19] Defendants falsely state that Plaintiff does "not challenge on appeal" the district court's determination that the risk disclosures were meaningful—Plaintiff does challenge this determination. PB-48-49.

price of his sales was 70% higher than the Class Period average stock price (ER-682_¶¶432-33), and Musk's stock sales were executed at near all-time highs for Tesla stock price (ER-682_¶433) and at times that aligned with Musk's 2022 purchase of Twitter. ER-682-84_¶¶435-42.

Defendants parrot the district court's argument that the timing of the sales was not suspicious because they were not linked to any misstatement, and argue there is no support of the notion that timing of sales are suspicious when they occur at all-time highs. DB-28-29. But this Court has acknowledged that this is relevant to assessing suspicious timing—*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003) ("fact that the stocks were sold . . . near the stock's peak" support finding of suspicious timing)—because this bears directly on the question of whether the sales are made "at times calculated to maximize the personal benefit from undisclosed inside information," *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999). PB-68-69.

Defendants also argue that Musk's incentive to inflate Tesla's stock price to fund his purchase of Twitter reflects a "routine corporate objective." DB-30. But this ignores allegations that it was *Musk*, not

32

Tesla, who needed a capital infusion to finance his acquisition of Twitter. ER-682-84_¶¶435-42.

In addition, Musk's history of fraud and misrepresentation also supports an inference of scienter, including that he was caught staging multiple videos misrepresenting Tesla's ADT. PB-69-70; ER-576-77_¶¶69-70, ER-679_¶422. That these videos predated the Class Period (DB-32-33) does not undermine their relevance in showing his propensity for deceit. *See Tellabs*, 551 U.S. at 310 (scienter analyzed holistically).

Further, Judge Chen's summary judgment finding that "Mr. Musk recklessly tweeted to the public" about Tesla further demonstrates Musk's habit of making misstatements. ER-679-80_¶423. Defendants' case—*Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 400 (S.D.N.Y. 2022)—is not to the contrary, as it addressed previous **accusations** of corporate misconduct, not a summary judgment order. DB-33.

## IV. THE COMPLAINT SUFFICIENTLY PLEADS LOSS CAUSATION

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). It involves "no more than the familiar test for proximate cause[,]" which can be met in "an 'infinite variety' of ways." *Mineworkers'*

*Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Here, Plaintiff adequately alleged a causal link between the misstatements and Defendants' corrective disclosures. ER-662-73_¶¶377-402.

As a preliminary matter, Defendants suggest Plaintiff cannot plead loss causation because the CA-DMV letters were public prior to the corrective disclosures. DB-58. But the CA-DMV letters were obtained by Plaintiff via freedom of information laws (ER-619_¶226)—they were not public in any meaningful sense.[20] As such, Defendants do not demonstrate the CA-DMV letters were "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014) (rejecting truth-on-the-market challenge to loss causation, even though the facts were posted on the FDA's website days before the corrective disclosure). Indeed, the sole

---

[20] Defendants' out-of-circuit case law is distinguishable. In *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 512 (2d Cir. 2010), the facts were "the subject of continuing media reports" over the year prior to the corrective disclosure. Likewise, in *Teachers' Retirement System of Louisiana v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007), the facts were disclosed in SEC filings.

news article Defendants cite (DB-49)—which was published two years into the Class Period—does not "prove" that this information was widely disseminated, which, in any event, is a fact issue not appropriate at this stage. *Provenz*, 102 F.3d at 1492-93.

As for the corrective disclosures, Defendants argue that the announcement of NHTSA's investigation into Tesla's ADT (the first partial disclosure), "without more, is insufficient . . . as it does not reveal fraudulent practices to the market." DB-59 (cleaned up). But this disclosure did "more" than announce an investigation, it specifically disclosed an investigation stemming from multiple crashes caused by Tesla's ADT—which goes to the core of the misstatements. ER-662-65_¶¶378-80.

Defendants then argue the second and fifth partial disclosures—where Tesla recalled hundreds of thousands of vehicles (ER-665-66_¶¶382-85, ER-670-73_¶¶397-402)—"do not reveal the falsity of any prior alleged misstatement." DB-59. But "to be corrective, a disclosure need not precisely mirror the earlier misrepresentation." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). These disclosures further revealed serious problems with Tesla's ADT, thereby

partially revealing the falsity of Defendants' misstatements. ER-665-67_¶¶382-89, ER-670-73_¶¶397-402.

As for Musk's January 26, 2022 admission that Tesla's ADT was not yet safer than humans (the third partial corrective disclosure, ER-666-67_¶¶386-89), Defendants argue Plaintiff "fail[s] to account for the other negative information that Tesla released during the same earnings call." DB-60. Yet, "[w]hether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial." *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016). Further, analyst commentary linking this disclosure (as well as the fifth one) to the subject of the misstatements confirms their corrective nature. *See Lloyd*, 811 F.3d at 1210-11; *e.g.*, ER-667_¶388, ER-672-73_¶401.

Finally, Defendants use *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) to argue the fourth corrective disclosure did not cause losses. DB-60. But plaintiffs in *Curry* "only cite[d] customer complaints . . . without a subsequent investigation." 875 F.3d at 1225. Here, NHTSA launched an investigation and issued document requests due to hundreds of complaints of phantom braking (one of the safety issues Defendants' fraud concealed). ER-667-70_¶¶390-96.

## CONCLUSION

This Court should reverse the district court's decision or vacate and remand for further proceedings.

Dated: July 7, 2025          Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Carol C. Villegas*
Carol C. Villegas *(pro hac vice)*
Jake Bissell-Linsk *(pro hac vice)*
Guillaume Buell *(pro hac vice)*
140 Broadway
New York, NY 10005
Telephone: 212 907 0700
Fax: 212 818 0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
gbuell@labaton.com

*Attorneys for Plaintiff-Appellant*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar. No. 250893)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Fax: (510) 725-3001
lucasg@hbsslaw.com

*Liaison Counsel for the Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Aaron L. Castle *(pro hac vice)*
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200

Fax: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Plaintiff-*
*Appellant*

## STATEMENT OF RELATED CASES

There are no known related cases pending in this Court.

Dated: July 7, 2025                    */s/ Carol C. Villegas*
                                        Carol C. Villegas

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-55

I am the attorney or self-represented party.

**This brief contains** 6,948 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Carol C. Villegas **Date** 07/07/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*